Carolee KOSTER, Plaintiff,

v.

The CHASE MANHATTAN BANK and Allan Ross, Defendants.

No. 81 CV 5018 (RJD).

United States District Court, S.D. New York.

May 19, 1988.

849

Carolee Koster, New York City, pro se.

Proskauer, Rose, Goetz & Mendelsohn, and Milgrim, Thomajan & Lee, P.C., New York City, for defendants.

## OPINION AND ORDER

DARONCO, District Judge.

The instant action was commenced in 1981. During the course of pre-trial litigation, many issues were vigorously contested before three District Court Judges and a Magistrate. On March 23, 1988, a 10 day bench trial commenced during which 16 witnesses, including plaintiff and defendant Ross, testified.

After weighing all the evidence, including resolving issues of credibility, the Court finds the plaintiff has failed to convince this Court of the merits of her case. Accordingly, all of plaintiff's claims are dismissed as to both defendants.

## FINDINGS OF FACT

1. Plaintiff Carolee Koster is a female, and was an employee, 42 U.S.C. § 2000e(f), of the Chase Manhattan Bank, N.A., from 1973 until 1980.

2. Defendant, The Chase Manhattan Bank, N.A. ("Chase" or the "Bank") is a national banking association with its principal office in New York, New York. Defendant Chase is engaged in an industry that affects commerce and employs more than 15 employees and is an employer within the meaning of 42 U.S.C. § 2000e(b).

3. Defendant Allan S. Ross, was a Vice-President of Chase from October 1978 until January 1981.

*Charges of Discrimination; Judicial Action*

4. On or about September 25, 1980, plaintiff filed a discrimination charge with the New York Commission of Human Rights and the Equal Employment Opportunity Commission ("EEOC"). She alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.;* the Equal Pay Act, 29 U.S.C. § 206(d); and various pendant claims under the laws of the State and City of New York. During the course of pre-trial litigation, all of the claims except the Title VII claims alleging disparate treatment and sexual harassment were dismissed. (See ¶ 9, *infra*).

5. In the agency charge, plaintiff did not name Allan Ross as a defendant, nor did she allege sexual harassment by him.

6. A right-to-sue letter was issued on or about June 5, 1981, without a determination on the merits.

7. On or about August 12, 1981, plaintiff commenced the instant action. In her Complaint, she alleged for the first time she had been sexually harassed by defendant Ross.

8. Plaintiff has not alleged sexual discrimination by any Chase employee other than defendant Ross.

9. The specific claims remaining in this action are:

A. Disparate Treatment: Salary. Plaintiff alleges she was discriminatorily denied salary increases throughout her employment at Chase.

B. Disparate Treatment: "Transfer." Plaintiff alleges that in 1979 and 1980, defendant Chase denied her a transfer to another department within the Bank but allowed similarly situated males to transfer. The only position plaintiff identifies with any specificity to which she was denied a transfer is the Human Resources "Generalist" or "Executive"[1] position in the Real Estate Finance Department. Testimony of plntf.

C. Sexual Harassment: *Quid Pro Quo.* Plaintiff asserts that defendant Ross demanded and received sexual favors from her in exchange for employment security and benefits. She further contends that when she refused to continue providing sexual favors, defendant Ross caused her to be denied salary increases and a transfer to another department within the Bank, and that he was instrumental in the termination of her employment.

D. Sexual Harassment: Hostile Environment. Plaintiff claims defendant Ross subjected her to a campaign of abuse in retaliation for the cessation of their sexual relationship, that he treated her in an abusive and demeaning way in the workplace.

*Plaintiff's Employment History*

10. Plaintiff was hired by Chase in October 1973 as the Evening Coordinator of the Learning Center.

11. In late 1973, plaintiff became a training analyst in the Operations Department.

12. In November 1975, plaintiff was promoted to senior training analyst. Subsequently, her duties included the development and execution of communications designed to explain the Integrated Product and Process Measurement and Improvement Program ("IPPMIP") to Bank personnel.

13. In November 1976, plaintiff was promoted to Assistant Treasurer, level 7, at a salary of $18,000. Assistant Treasurer is the first officer level position at the Bank.

14. In April 1977, plaintiff was transferred to the Corporate Human Resources Department ("CHR"). The CHR department had overall responsibility for the personnel activities of Chase, including, *inter alia,* compensation, benefits, organization planning, staffing, training and development, and employee relations.

---

1. The defendants distinguish between a Human Resources Generalist and a Human Resources Executive. The defendants contend Executive is a higher level position than Generalist. Plaintiff, who does not make this distinction, alleges she was a Generalist. Thus, it would be easier for plaintiff to demonstrate she was qualified for another Generalist position than for a higher level Executive position. In order to afford any advantage to plaintiff, the Court finds the position at issue in the Real Estate Finance Department to be a Generalist position.

15. From 1975 until 1984, Alan F. Lafley, Executive Vice–President, was the head of the CHR department and the Human Resources function throughout the Bank.

16. From April 1977 until November 1978, plaintiff reported to Luke Carbone, Jr., as did her co-worker William Gilbert. During this period, plaintiff's principal duties were to write personnel policies.

17. In June 1977, plaintiff's salary was increased to $19,800.

18. In June 1978, plaintiff's salary was increased to $22,800 (a 15.2% increase within a 12 month period).

19. Effective August 1, 1978, plaintiff was promoted to Second Vice–President, level 8.

20. In October 1978, defendant Allan S. Ross, who was hired by and reported to Alan F. Lafley, began working at Chase as Vice–President for Human Resources Planning, Programs and Systems. (See ¶ 66, infra).

21. In November 1978, plaintiff's unit was transferred and became one of defendant Ross' supervisory responsibilities. At that time, plaintiff was assigned to a task force headed by defendant Ross, the purpose of which was to identify and analyze the current structure of the Human Resources. Testimony of def. Ross, plntf.

22. In January 1979, plaintiff began reporting directly to defendant Ross.

23. In early 1979, plaintiff was appointed Manager of Human Resources Staffing and Development, although no corporate title change occurred at that time. Plaintiff assumed responsibility for staffing Human Resources positions at the Assistant Treasurer and Second Vice–President levels. Additionally, she assisted defendant Ross in staffing Human Resources positions at the Vice–President level.

24. In February 1979, Mr. Lafley authorized a salary increase for plaintiff from $22,800 to $25,000 (a 9.6% increase within a 12 month period).

25. In March 1979, plaintiff assumed the additional duty of assisting defendant Ross in budgeting activities. Plaintiff's new duty included the collection of data relating to the annual budget for the CHR department and all Human Resources components throughout the Bank.

26. Subsequently, plaintiff was relieved of her budgeting duties.

27. In August 1979, at the recommendation of defendant Ross, Mr. Lafley promoted plaintiff to Vice–President, level 11.

28. At the time defendant Ross recommended plaintiff's promotion to Vice–President, level 11, he also recommended that her salary be increased to the minimum salary for a level 11 at the time. Mr. Lafley did not approve the recommended increase; instead, he authorized an increase to $26,900. This represented a 17.9% increase within a 12 month period and was the maximum permitted under Chase's compensation guidelines. Testimony of Lafley, def. Ross. (See ¶ 35, 39, infra).

29. In February 1980, 6 months after her August 1979 increase, Mr. Lafley, at defendant Ross' recommendation, increased plaintiff's salary to $29,000 (a 7.8% increase within a 12 month period).

30. In late March or early April 1980, plaintiff was offered but refused a position in which she was to report to Neil Owen, a Vice–President, level 11, within CHR. Testimony of Lafley, Owen, def. Ross.

31. On or about July 25, 1980, plaintiff was advised by Mr. Lafley that there was no position available for which she was qualified, other than the position reporting to Owen. Accordingly, Mr. Lafley informed plaintiff that effective July 31, 1980, her employment with Chase was terminated. (See ¶¶ 81–89, infra). Her benefits were continued through October 31, 1980. (See ¶¶ 92–93, infra).

*Chase's Compensation System*

32. Officer titles were related to salary grades by means of level designation. Within each title was one or more levels with a concomitant salary range. An Assistant Treasurer was a level 7; a Second Vice–President could be a level 8, 9 or 10;

and a Vice–President could be a level 11 through 16. Testimony of Lafley, plntf.

33. Each level was correlated with a salary range. Each salary range had a minimum, midpoint, and maximum salary. The salary ranges for a given level may overlap with the range for the previous or the succeeding level.

34. An individual's salary was indexed at 1.00 to the midpoint of the salary range. The relationship of the individual's salary to the corresponding point on the salary range is referred to as a "compa-ratio." Thus, the compa-ratio for a salary at the midpoint of the salary range for a given level was 1.00; the compa-ratio for the minimum salary of that range was .80; and the compa-ratio for the maximum salary of that range was 1.2.

35. Chase's compensation guidelines in 1976, 1977, 1978, 1979 and 1980 imposed 2 restrictions on salary increases: (a) an officer could not receive a salary increase sooner than 6 months after his/her last increase; (b) an aggregate salary increase could not exceed 18% within a 12 month period without special approval of Chase's Chief Executive Officer or a member of the management committee. Testimony of Lafley.

36. Title, level, and salary decisions were made separately. Thus, a promotion in title or level was not necessarily accompanied by an immediate salary increase. Testimony of Lafley, def. Ross.

37. Salaries were related to performance. Once an employee fully met the requirements of his/her job, his/her salary would be raised to the minimum salary for his/her level. The midpoint was for one fully meeting the requirements of the position and whose performance met management's expectations; the top half of the salary range was for the exceptional, outstanding performers. Testimony of Lafley.

38. Pursuant to Chase's policy, an officer had to be in a new job for at least six months before a title and level change could occur. Testimony of Lafley, Owen, def. Ross.

*Plaintiff's Salary History*

39. Plaintiff's officer salary increases are compared below to Chase's compensation guidelines.

| | Date of Increase | | | | | |
|---|---|---|---|---|---|---|
| | 11/76 | 6/77 | 6/78 | 2/79 | 8/79 | 2/80 |
| Plaintiff's Level and Officer Title | AT, level 7 | AT, level 7 | AT, level 7 | 2–VP, level 8 | VP, level 11 | VP, level 11 |
| Plaintiff's Salary after Increase | $18,000 | $19,800 | $22,800 | $25,000 | $26,900 | $29,000 |
| Amount of Increase | N/A* | $ 1,800 | $ 3,000 | $ 2,200 | $ 1,900 | $ 2,100 |
| Percentage Increase Within 12–Month Period | N/A* | 10% | 15.2% | 9.6% | 17.98% | 7.8% |
| Plaintiff's Compa–Ratio | .80 | .84 | .91 | .82 | .62 | .62 |
| Length of Time Since Last Increase | N/A* | 7 mos. | 12 mos. | 8 mos. | 6 mos. | 6 mos. |
| Shortest Time In Which Increase Could Be Granted | 6 mos. | 6 mos. | 6 mos. | 6 mos. | 6 mos. | 6 mos. |
| Maximum Permissible Percentage In- | | | | | | |

| | 11/76 | 6/77 | 6/78 | 2/79 | 8/79 | 2/80 |
|---|---|---|---|---|---|---|
| crease Within 12–Month Period | 18% | 18% | 18% | 18% | 18% | 18% |
| Minimum Salary for Plaintiff's Level | $18,000 | $18,900 | $20,000 | $24,400 | $34,800 | $37,200 |

\* Plaintiff was not an officer before 11/76.

40. In August 1979, when plaintiff was promoted to Vice–President, she was given the maximum salary increase permitted by Chase's compensation guidelines. The increase did not bring her salary up to the minimum level for a level 11. She was not at the minimum because she received a three level promotion and a title or level promotion is not automatically accompanied by a salary increase. Testimony of Lafley.

41. During the relevant time period, there were many officers at Chase whose salaries were below the minimum salary for their level. Testimony of Lafley. Of particular significance is one male Vice–President, level 11, who received a salary below the minimum for several years, including the relevant period. He later became the youngest Executive Vice–President at Chase. Testimony of Lafley, Scicutella.

42. An employee was particularly likely to be below the minimum if a level promotion was given faster than the person could begin to fulfill the responsibilities attendant to the level. Testimony of Lafley. (See ¶ 37, *supra*).

43. Although it was not mandatory, it was Chase's policy, within the restrictions of the 6 month limitation and the 18% rule (see ¶ 35, supra), and the individual's performance, to raise the salaries of individuals who were below the minimum level for their level, up to the minimum of the salary range for their level within 1 year from the date the individual assumed that level. Testimony of Lafley.

44. Six months after receiving her promotion to level 11, plaintiff received another salary increase. This was as soon as was permissible under the guidelines. Plaintiff's employment was terminated before the first anniversary of her promotion to level 11.

45. During the relevant period, no employee in Human Resources, other than plaintiff, was given a three level promotion (level 8 to 11). Testimony of Lafley.

*Salary Discrimination.*

46. Plaintiff's salary was low compared to both males and females at level 11, as well as at levels 8, 9 and 10.

47. In support of her claim that her salary was discriminatorily depressed compared to similarly situated males in Human Resources, plaintiff identified male Second Vice–Presidents, levels 8, 9 and 10, male Vice–Presidents, level 11, and male "Generalists," and their respective salaries as of July 31, 1979. All of the Second Vice–Presidents, levels 8, 9 and 10, except 3, received higher salaries than plaintiff. During the relevant period, all of the male Vice–Presidents, level 11, earned more than plaintiff, as did the male Generalists.

48. Similarly, there were many females identified in Human Resources with titles of Second Vice–President, levels 8, 9 and 10, who, during the relevant period received higher salaries than plaintiff. Plaintiff acknowledged there were female Vice–Presidents, level 11, who, during the relevant period, also had higher salaries than plaintiff. Testimony of Plntf.

49. Early in her career at Chase, plaintiff began to register her dissatisfaction with her salary and the salary increases given to her. She complained to her immediate supervisors and when she did not receive a satisfactory response, she complained to her supervisor's superior. Additionally, in 1976, she also complained about her salary history and status to the personnel representative for the area to which she was assigned. Testimony of Plntf.

*Generalist*

50. A Human Resources "Generalist" functioned as an internal consultant to line

managers on the entire range of Human Resources issues. The "Generalist" advised managers on business issues as they related to Human Resources. Testimony of Lafley, Owen, def. Ross, plntf.

51. Broad, multi-functional experience was required in order to be considered for a "Generalist" position. Testimony of Lafley, def. Ross.

52. Plaintiff lacked the multi-function experience necessary for consideration as a "Generalist." Testimony of Lafley, def. Ross.

53. Plaintiff lacked the necessary experience of having advised line managers. Testimony of Lafley, plntf.

54. Plaintiff was not a Human Resources "Generalist," nor was she qualified or experienced enough to be. Testimony of Lafley, Owen, def. Ross.

*Assessments of Plaintiff's Performance*

55. In assessing plaintiff's potential as evidenced by her past performance, Mr. Lafley was most concerned with her performance in her more recent positions. He was not concerned with plaintiff's performance at the earlier entry level positions. Testimony of Lafley.

56. Mr. Lafley reviewed plaintiff's experience, performance and potential with other employees who were familiar with her work. In addition, Mr. Lafley had opportunities to observe plaintiff's performance directly. Testimony of Lafley.

57. With respect to plaintiff's staffing and development function, Mr. Lafley concluded that plaintiff had failed to obtain input from managers about lower level personnel who were "high performers" and had potential; nor had she obtained any additional input from other Human Resources personnel. Her efforts did not lead to the expected inventory of names, nor to the anticipated results in placements or moves. Testimony of Lafley.

58. Mr. Lafley determined plaintiff's performance of the budgeting duties was not satisfactory because she merely collected and reported budgeting data; she failed to identify the issues revealed by the data. Testimony of Lafley.

59. Plaintiff made significant errors in the budget and missed deadlines. Testimony of Lafley, Owen, def. Ross.

60. Line personnel complained about the number of budget-related forms plaintiff asked them to complete. Testimony of Lafley, def. Ross.

61. Mr. Lafley concluded that plaintiff came to meetings unprepared and, once there, she did not make any contribution. Accordingly, he instructed defendant Ross not to include her in any future meetings of Mr. Lafley and defendant Ross. Testimony of Lafley, def. Ross.

62. Mr. Lafley assessed plaintiff's performance as appropriate to that of a level 8 or, at best, a level 9. Because salaries were related to performance, he questioned whether her salary should be brought up to the minimum for a level 11. Testimony of Lafley.

63. Performance reviews of plaintiff in her earliest positions were more favorable than those she received near the end of her employment at Chase. In this regard, it should be noted that under Mr. Lafley's direction, the performance assessment procedure was changed because it did not accurately distinguish among performance levels—i.e. 20% of the employees were rated as doing a satisfactory job and 80% were rated as doing superior, outstanding work. Testimony of Lafley.

64. Both Mr. Lafley and defendant Ross concluded plaintiff was better suited for administrative tasks. Testimony of Lafley, def. Ross.

*Reorganization of Human Resources*

65. At some time prior to the fall of 1978, Mr. Lafley determined that duplicative functions were being performed within Human Resources and better controls were needed.

66. Defendant Ross was hired in the fall of 1978 by Mr. Lafley. Defendant Ross' initial mandate was to propose a plan to reorganize the Human Resources area in order to eliminate duplicative and unnecessary positions. In order to achieve the goals of the reorganization and to increase

efficiency within all areas of Human Resources, positions were to be reassigned, combined, or eliminated as necessary. Testimony of Lafley, def. Ross.

67. Defendant Ross received additional duties and personnel reporting to him as new functions were increasingly added to his supervisory responsibilities.

68. Mr. Lafley discussed with defendant Ross his observations of plaintiff and his concern that defendant Ross had made a mistake in recommending her promotion to Vice–President. Mr. Lafley believed defendant Ross had incorrectly assessed her skills and potential.

69. Mr. Lafley instructed defendant Ross that as a part of the reorganization of the CHR department, he was to assign plaintiff primarily to administrative responsibilities. Testimony of Lafley. (See ¶¶ 80–81, *infra*).

70. Specifically, plaintiff was to report to Neil Owen, whose group had the greatest administrative workload. Testimony of Lafley, Owen, def. Ross.

71. Neil Owen was an employee of the American Broadcasting Companies and had reported to defendant Ross when he was employed there. He was introduced to Mr. Lafley by defendant Ross. Mr. Lafley interviewed Mr. Owen and concurred with defendant Ross that Chase should hire Mr. Owen. Testimony of Lafley, Owen, def. Ross.

72. Mr. Owen was not valuable to Chase because of the length of his prior work experience. Rather, it was his previous experience, intellect and analytic ability which made him valuable to Chase. Testimony of Lafley.

73. Mr. Lafley believed Mr. Owen could make a significant contribution in the data systems and processes area because of his knowledge of systems and processes and his analytic ability. Testimony of Lafley, Owen.

74. In February 1979, Mr. Owen was hired as a Second Vice–President, at an initial salary of $28,000, for a 6 month probation period.

75. Six months later, Mr. Owen was given a promotion to Vice–President, level 11, with a salary increase to $33,000. (See ¶ 38, *supra*).

76. Mr. Owen's initial mandate was somewhat unstructured and not announced to Chase employees. In general, Mr. Owen was charged with analyzing and reorganizing all the data processing systems and processes in the Bank that interacted with the Human Resources information system. The systems and processes were to be made more efficient, cost effective, user friendly, and less redundant. Testimony of Owen.

77. Mr. Owen reported directly to defendant Ross.

78. In the course of his work, Mr. Ross had direct contact with management committee members.

79. Although Mr. Owen was the same level and title as plaintiff, his experience, expertise, and the purpose for which he was hired, meant he was not similarly situated to plaintiff.

*Termination*

80. In early 1980, Mr. Lafley ascertained that duplicative functions were being performed by plaintiff and 2 other CHR employees, Nancy Hutter and Neil Owen. Testimony of Lafley, def. Ross.

81. Because of the goal to reduce duplicative functions, and because he believed plaintiff was better suited to administrative tasks, Mr. Lafley told defendant Ross to reassign plaintiff to report directly to Mr. Owen. Testimony of Lafley, Owen, def. Ross.

82. After assignment to Mr. Owen, plaintiff was to have the same title and salary. Testimony of Lafley.

83. In the spring of 1980, defendant Ross told Mr. Owen plaintiff was to begin reporting to him. Defendant Ross also told plaintiff that effective immediately she was to report to Mr. Owen. Testimony of Owen, def. Ross.

84. Plaintiff refused to accept the position reporting to Mr. Owen. She failed to attend a meeting scheduled with Mr. Owen in order to begin her new position in which

she was to report to him. Testimony Lafley, Owen, def. Ross.

85. Defendant Ross reported to Mr. Lafley that plaintiff had refused to accept the position reporting to Mr. Owen. Testimony of Lafley, def. Ross.

86. Mr. Lafley inquired of his direct reports whether they were aware of any position that plaintiff might fill. They responded they knew of no position on their staff or elsewhere in the Bank.

87. In late June 1980, Mr. Lafley met with plaintiff and urged her to accept the position reporting to Mr. Owen. Plaintiff again refused to accept this position. Mr. Lafley stated he did not know of any other available position for which plaintiff was qualified. Testimony of Lafley.

88. Plaintiff asked Mr. Lafley that she be considered for the position of Human Resources "Generalist" in the Real Estate Finance Department. Her request was refused as Mr. Lafley believed she was not qualified for that position. (See ¶¶ 99–100, *infra*). Testimony of Lafley, plntf.

89. On or about July 25, 1980, Mr. Lafley met with plaintiff to inform her that because she would not accept the position reporting to Mr. Owen and no other position was available for her, her employment would be terminated effective July 31, 1980. Testimony of Lafley.

90. Mr. Lafley offered to assist plaintiff in finding a position outside Chase, but plaintiff refused the offer. Mr. Lafley also reviewed with plaintiff the severance pay package the Bank was willing to give her. Testimony of Lafley.

91. Plaintiff again asked to be considered for the position in the Real Estate Finance Department. Mr. Lafley reiterated that she lacked the skills and experience needed for the position. Testimony of Lafley, plntf.

92. In lieu of additional notice of her termination, plaintiff was given three months salary. She also received 7 weeks severance pay, vacation pay, and continued benefits coverage through October 31, 1980.

93. Chase had a policy which applied to officer level employees who were terminated because of a lack of work, or an elimination of their position. The "lack of work" policy was not applicable to plaintiff because she was offered, but refused, a position in which she would have retained her salary and title. Testimony of Lafley.

94. Mr. Lafley, not defendant Ross, made the decision to terminate plaintiff because she refused to accept the only available position for which he believed she was qualified. Testimony of Lafley.

*Plaintiff's Request to Transfer; Real Estate Finance Department*

95. There were several ways that an officer could pursue a transfer out of the CHR department to another Human Resources position: (a) By speaking to his/her manager or to his/her manager's superior; (b) by speaking directly to Mr. Lafley; (c) by contacting a Human Resources officer in one of the other Bank departments; or, (d) by contacting the manager of a vacant position. Thus, if an employee's manager objected or obstructed an employee's attempt to transfer, he/she could approach his/her manager's superior or Mr. Lafley, who could overrule the manager. Testimony of Lafley.

96. Defendant Ross' permission or authorization was not required for plaintiff to transfer out of his area of supervision to another Human Resources position in the Bank. Testimony of Lafley, def. Ross, plntf.

97. Mr. Lafley was aware of plaintiff's desire to transfer out of defendant Ross' area. Mr. Lafley was first told by defendant Ross that plaintiff wanted to transfer out of his area. In June 1980, plaintiff also told Mr. Lafley she wanted to transfer out of defendant Ross' area. Testimony of Lafley, def. Ross, plntf.

98. For an officer to transfer to the position of Human Resources "Generalist" in a line department at Chase, approval was needed from Mr. Lafley and the head of the department to which the officer wished to transfer. The approval of Mr. Lafley and the head of the Real Estate

Finance Department was required for one to transfer to that particular department.

99. In or about May 1980, a vacancy occurred in the Real Estate Finance Department for a Human Resources "Generalist". Mr. Lafley, together with Richard Boyle, the head of the Real Estate Finance Department, decided to hire Eugene Kinney for that position. Mr. Kinney was brought into Chase for this position because of his experience with two other major financial institutions, experience which Mr. Lafley and Mr. Boyle believed was applicable to addressing the critical needs in that area. Testimony of Lafley.

100. Plaintiff asked Mr. Lafley that he consider her for the Real Estate Finance position. Mr. Lafley concluded that plaintiff was not qualified for the position because she had not performed well in her position as Manager of Staffing and Development, had performed her budgeting duties unsatisfactorily, and because she did not have the broad-based, multi-function experience required. Testimony of Lafley.

101. Defendant Ross did not negatively influence Mr. Lafley's decision not to recommend or hire plaintiff for the position in the Real Estate Finance Department. Testimony of Lafley.

102. Defendant Ross could not have prevented plaintiff from interviewing for the Real Estate Finance position, as it was Mr. Lafley's approval that was required, not defendant Ross' approval. Testimony of Plntf.

*Sexual Harassment Claim: Quid Pro Quo.*

103. In February 1979, a consensual sexual relationship began between plaintiff and defendant Ross. While the genesis of the relationship is unclear, there is not a scintilla of credible evidence to suggest it was coerced or unwanted by either party.

104. During the spring of 1979, plaintiff told defendant Ross' brother, Stuart, that she was in love with the defendant. Testimony of Stuart Ross.

105. During the period of the affair, plaintiff did not complain to any employees of Chase about defendant Ross, nor did she complain to friends outside of Chase. Testimony of plntf.

106. Several of plaintiff's colleagues perceived her as being very happy with and comfortable around defendant Ross. Testimony of Coyle, Benmosche, Owen, Maley, Allen. She was described as being "in heaven" when she was with defendant Ross. Testimony of Benmosche.

107. Defendant Ross wanted to avoid negative consequences to his pending divorce and custody action, and in early June 1979, upon the advice of his attorney, defendant Ross told plaintiff their personal, sexual relationship must end. Testimony of def. Ross.

108. Initially, plaintiff resisted defendant Ross' attempts to end the affair. Some time in August 1979, however, plaintiff conceded the end of her affair with defendant Ross and, subsequently, it did end. Testimony of def. Ross.

109. Prior to the time she reported to defendant Ross, plaintiff received one level promotions. After reporting to defendant Ross for 7 months, she received a 3 level promotion to Vice-President, level 11. (See ¶ 39, *supra*).

110. Prior to the time she reported to defendant Ross, plaintiff received salary increases at one year intervals. Thereafter, plaintiff received 1 salary increase 8 months after her last increase (in February 1979), and 2 at 6 month intervals (in August 1979 and February 1980). (See ¶ 39, *supra*).

111. Defendant Ross was not authorized to unilaterally grant promotions or salary increases, nor to hire or discharge employees. His authority was restricted to recommending such actions, which required Mr. Lafley's approval to be effective. Testimony of Lafley, def. Ross, plntf.

112. No credible evidence was proffered that defendant Ross in any way denied or caused plaintiff to be denied salary increases, in any way interfered with or denied plaintiff's request to be transferred to another area of the Bank, or in any way caused her termination.

*Sexual Harassment: Hostile Environment*

113. Defendant Ross was hired by Chase to recommend a reorganization plan for Human Resources which would include the elimination of functions and positions. The nature of defendant Ross' duties and the power he was perceived to hold, threatened the job security of some employees. Consequently, he was perceived by some Chase employees as intimidating, difficult and discourteous. Testimony of Coyle, Benmosche, Owen, Maley.

114. Plaintiff was not singled out and mistreated by defendant Ross. No evidence of abusive behavior by defendant Ross towards plaintiff was adduced. Testimony of Coyle, Benmosche, Owen, Maley, Duran.

115. After their sexual relationship ended, defendant Ross did not criticize plaintiff to others. In fact, he was very protective of her when he received criticism about her from others. Testimony of Owen. However, defendant Ross' assessment of plaintiff's ability to grow and develop became less favorable during this period. Testimony of Lafley, Owen, def. Ross.

*Knowledge of the Affair by Chase*

116. Prior to her termination in July 1980 by Chase, plaintiff never complained to anyone at Chase that defendant Ross had sexually harassed her in any way. Testimony of Plntf.

117. Chase had an Affirmative Action Unit charged with the responsibility of investigating employee complaints of alleged discrimination. It was not restricted to non-officer employees. Although she knew of its existence, plaintiff never registered a complaint of sexual discrimination with the Affirmative Action Unit. Testimony of Plntf.

118. Chase had a "Sound–Off System" ("SOS") to which an employee, non-officer or officer, could address a complaint of alleged discrimination. An employee could visit an SOS representative during business hours, call a 24–hour hotline, or submit a written complaint. SOS assured complainants their identity would be kept confidential. Although she knew of its existence, plaintiff never registered a complaint of sexual discrimination with SOS. Testimony of Plntf.

119. As Chase's highest level personnel officer, Mr. Lafley had ultimate responsibility for Chase's compliance with employment discrimination laws. Plaintiff never complained to Mr. Lafley she was being or had been sexually harassed by defendant Ross. Testimony of Lafley, plntf.

120. Plaintiff had no reason to believe Mr. Lafley would not enforce Chase's policies with regard to employment discrimination. Testimony of Plntf.

121. In August 1980, after plaintiff was terminated by Chase, she hired an attorney who met with Mr. Lafley and registered a complaint of sexual discrimination on behalf of plaintiff. This was the first time Mr. Lafley learned of the affair between plaintiff and defendant Ross. Testimony of Lafley.

122. During the relevant period, Chase had written policies prohibiting discrimination based on gender. Testimony of Lafley, plntf.

CONCLUSIONS OF LAW

123. Jurisdiction and venue are properly in this Court. 42 U.S.C. § 2000e–5(f)(3).

*Disparate Treatment*

124. Title VII prohibits sex-based discrimination with respect to compensation, terms, conditions, or privileges of employment. 42 U.S.C. § 2000e–2(a)(1).

125. If a plaintiff successfully establishes a *prima facie* case and thereby raises an inference of discrimination, the defendant may rebut the inference of discrimination by articulating a legitimate, non-discriminatory reason for the challenged action. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The elements of a *prima facie* case will necessarily vary with the facts and type of discrimination alleged. *Id.*

126. The burden then shifts to the plaintiff to prove by a preponderance of the evidence the articulation is mere pretext for discrimination. *Id.* The plaintiff must

"persuade the Court that the employment decision more likely than not was motivated by a discriminatory reason," *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983), or that "the employer's proffered explanation is unworthy of credence." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 250, 101 S.Ct. 1089, 1092, 67 L.Ed.2d 207 (1981).

127. The burden of persuasion remains with the plaintiff at all times. *Burdine,* 450 U.S. at 253–54, 101 S.Ct. at 1093–94; *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824.

128. To be actionable, the allegedly unlawful employment act or practice must have occurred within 300 days of the filing of charges with the EEOC. Pursuant to 42 U.S.C. § 2000e–5(c), plaintiff's EEOC charge is deemed to have been filed on November 24, 1980. Therefore, to recover, the plaintiff must initially prove an act of unlawful discrimination within the 300 day filing period, i.e. January 30, 1980. *See Collins v. Manufacturers Hanover Trust,* 542 F.Supp. 663 (S.D.N.Y.1982).

129. Present effect may be given to plaintiff's claims of past salary discrimination only if she can prove they are part of a violation which continued during the filing period. *See United Airlines v. Evan,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). *See generally Bazemore v. Friday,* 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed. 2d 315 (1986).

130. To establish a present violation, the plaintiff must prove that related acts of discrimination occurred within the 300 day filing period. *See, e.g. Milton v. Weinberger,* 645 F.2d 1070, 1075 (D.C.Cir.1981).

*Salary Discrimination*

131. To successfully raise an inference of salary discrimination based on sex, the plaintiff must establish she was paid a lesser salary than a male for work substantially equal in the degree of skill, effort, and responsibility required, and which was performed under similar working conditions. *Foster v. Arcata Associates, Inc.,* 772 F.2d 1453, 1465 (9th Cir.1985); *Rossini v. Ogilvy & Mather, Inc.,* 597 F.Supp. 1120, 1154 (S.D.N.Y.1984).

132. Whether or not the work is "substantially equal" is determined by a comparison of the "actual job performance and content, not job titles, classifications or descriptions." *Foster,* 772 F.2d at 1466. Unequal pay for jobs which are merely similar does not subject an employer to Title VII liability. *See Spaulding v. University of Washington,* 740 F.2d 686, 700 (9th Cir.1984).

133. In the first instance, the Court carefully examined plaintiff's evidence of salary discrimination for the relevant period. Plaintiff's evidence consisted of the names of male employees in Human Resources, their level designation, and salaries as of July 31, 1979 (salaries which, presumably, were in effect during the relevant period). (See ¶ 47, *supra* ). Of those at plaintiff's level or below, all except three received higher salaries than plaintiff.

134. Other than some general statements of plans and duties and her own conclusory statement that they performed basically the same functions, plaintiff failed to address the "substantially equal" test. Plaintiff's data merely showed she was paid less than some males at her level and below. As such, "the statistical picture (is) incomplete" and fails to show, as it must, that she was performing comparable work for less pay. *Merrill v. Southern Methodist University,* 806 F.2d 600, 607 (5th Cir.1986) (mere showing of disparate salaries is insufficient as a matter of law). *See Horton v. Town of Bennington,* 603 F.Supp. 1254, 1256–57 (D.Vt.1985).

135. Assuming *arguendo* plaintiff made out a *prima facie* case, she does not, nor could she, based on the evidence adduced at trial, make a showing that the defendant's articulation for the challenged salary actions were mere pretext. 42 U.S.C. § 2000e–2(h); 29 U.S.C. § 206(d). Defendant Chase contends that as of August 1979, plaintiff's salary was below the minimum for her level because she was the only level 11 Vice–President who had received a 3 level promotion. Promotions and salaries are separate considerations

and within the constraints of Chase's compensation guidelines, plaintiff was granted the maximum salary increase in 1979. (See ¶¶ 35, 36, *supra*). *See Covington v. Southern Illinois University*, 816 F.2d 317 (7th Cir.1987). Additionally, she was given another salary increase 6 months later, which was as soon as allowed by Chase's guidelines.

136. Nor did plaintiff's evidence address the many neutral factors that influence salary decisions. Those factors include but are not limited to education, employment experience, employment history at Chase including specific experience in Human Resources, management's assessment of the employee's performance, and professional achievements. *Merrill v. Southern Methodist University*, 806 F.2d 600, 607 (5th Cir.1986).

137. For the Court to conclude from the scanty information provided by plaintiff that Chase intentionally engaged in salary discrimination would "be mere speculation, not proof." *McDaniel v. Temple Independent School District*, 770 F.2d 1340, 1348 (5th Cir.1985).

138. Defendant Chase also asserts, and plaintiff did not deny, that females at plaintiff's level and below were paid higher salaries than plaintiff. Thus, the evidence established that both males and females were paid higher salaries than plaintiff. (See ¶ 48, *supra*).

139. Accordingly, plaintiff has not persuaded the Court that the salary decisions of which plaintiff complains were more than likely due to discriminatory animus, *Aikens*, 460 U.S. 711, 103 S.Ct. 1478, or that the employer's articulation is unworthy of credence. *Burdine*, 450 U.S. 248, 101 S.Ct. 1089.

■ 140. Plaintiff also alleges acts of salary discrimination outside the filing period. As no present violation was found, the Court was not required to consider plaintiff's evidence concerning events prior to 1980. However, the Court did examine the evidence with respect to these otherwise timebarred discriminatory acts and finds them to be meritless.

141. Plaintiff's efforts to compare her salary to that of male "Generalists" are equally meritless, as she was not a "Generalist" and cannot claim she was similarly situated. (See ¶ 54, *supra*).

142. The Court finds no evidence of salary discrimination and, therefore, plaintiff's claim of disparate treatment with regard to salary is dismissed in its entirety.

*Transfer*

143. The elements of a *prima facie* case of a discriminatory denial of a transfer are (a) plaintiff was a member of a protected class; (b) she was qualified for and applied for an open position; (c) she was denied the requested transfer; and, (d) thereafter the defendant employer continued to seek applicants with similar qualifications. *See, e.g. Rossini v. Ogilvy & Mather, Inc.*, 597 F.Supp. 1120, 1140 (S.D. N.Y.1984); *Colucci v. New York Times Co.*, 533 F.Supp. 1005 (S.D.N.Y.1982).

■ 144. Plaintiff's claim fails at the *prima facie* level because she has not proved she was qualified for the position of "Generalist" in the Real Estate Finance Department. (See ¶ 54, *supra*). The credible evidence established she was not a "Generalist" as she claims; rather, she was the Manager of Human Resources Staffing and Development, a lower position than "Generalist." (See ¶ 23, *supra*).

145. An inquiry into plaintiff's experience, performance evaluations, and assessment of her potential does not lend any support to her contention she was qualified for or possessed the prerequisites as set forth by management for consideration as a "Generalist" in the Real Estate Finance Department. (See ¶¶ 50–54, *supra*). At best, she was a Manager who was not performing as well as her superiors had hoped, and she was being recast into more administrative functions which, it was believed, were more in keeping with her capabilities. (See ¶¶ 57–64, *supra*).

146. Absent a hint of discrimination, the Court may rely on the evaluation of supervisors. *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir.1985).

147. Even if plaintiff had met the *de minimus* burden of establishing a *prima facie* case, *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093, she cannot show the defendant's reasons for denying her the transfer are mere pretext. Defendant Chase contends plaintiff was not qualified by either experience, current position or recent performance. Despite her recent 3 level promotion to level 11, she was performing at a level 8 or 9. Plaintiff did not show that management's assessment of her qualifications were the result of discrimination, *see Hill v. Seaboard Const. Line RR,* 642 F.Supp. 319, 322–323 (M.D.Fla.1986) (plaintiffs failed to show supervisor's decision making process used to assess their qualifications was any different than that used with nonminority candidates), nor that defendant Chase had any duty to consider her. *See Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1133 (11th Cir.1984) (plaintiff makes out a *prima facie* case of employment discrimination in promotions if he establishes company had some reason or duty to consider him for post). "(C)ompetence in writing may not have rendered her qualified for the position." *Rossini v. Ogilvy & Mather, Inc.,* 597 F.Supp. 1120, 1171 (S.D.N.Y.1984).

148. Plaintiff attempted to allege denial of transfers to other departments, but failed to allege with any specificity what they were, or when and if they were available. "(T)here can be no inference of discrimination where no job opening is shown to exist." *Rossini,* 597 F.Supp. at 1171.

149. For all the foregoing reasons, plaintiff's claim of discrimination in denial of a transfer is dismissed in its entirety.

*Sexual Harassment: Quid Pro Quo*

150. The *prima facie* elements of a *quid pro quo* claim are:

"(1) The employee belongs to a protected group.

(2) The employee was subject to unwelcome sexual harassment.

(3) The harassment complained of was based upon sex.

(4) The employee's reaction to harassment complained of affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment. The acceptance or rejection of the harassment by an employee must be an express or implied condition to the receipt of a job benefit or the cause of a tangible job detriment in order to create liability under this theory of sexual harassment. As in the typical disparate treatment case, the employee must prove that she was deprived of a job benefit which she was otherwise qualified to receive because of the employer's use of a prohibited criterion in making the employment decision.

(5) Respondeat superior."

*Jones v. Flagship International,* 793 F.2d 714, 721–22 (5th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987), citing *Henson v. City of Dundee,* 682 F.2d 897, 909 (11th Cir.1982).

151. "The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome,'" *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 2406, 91 L.Ed.2d 49. That is, by her conduct, plaintiff must have made it known the advances were offensive and undesired. *Id.*

152. As found in ¶¶ 103–104, *supra,* not a scintilla of evidence was proffered that even hinted the affair with defendant Ross was unwelcome. In fact, plaintiff's own witnesses support the conclusion plaintiff welcomed the relationship with defendant Ross.

153. Further, plaintiff cannot make out a claim of *quid pro quo* sexual harassment because she did not suffer any adverse employment actions during the affair or after it was terminated. To the contrary, she was promoted to Vice–President, received a three level promotion, and was given salary increases at more frequent intervals than prior to the sexual relationship with defendant Ross. (See ¶ 39, *supra* ).

154. Plaintiff's allegation that defendant Ross, in retaliation for the termination of their sexual relationship, caused

her to be denied a transfer to the Real Estate Finance Department, is not substantiated by the evidence. There was no evidence defendant Ross participated in the decision that plaintiff would not be allowed to interview for the position because she was not qualified. (See ¶¶ 98–99, *supra*). Further, defendant Ross could not have prevented her transfer as the evidence shows defendant Ross' authority with regard to plaintiff was limited to recommendations which then required the approval of Mr. Lafley to become effective. (See ¶ 111, *supra*).

155. Defendant Ross could not unilaterally cause plaintiff's termination, which required the approval of Mr. Lafley. (See ¶ 111, *supra*). There was no evidence defendant Ross even recommended plaintiff's termination, which was initiated and executed by Mr. Lafley. (See ¶ 94, *supra*). *See Highlander v. K.F.C. National Management Co.*, 805 F.2d 644, 649 (6th Cir.1986) (no sexual harassment where, *inter alia,* alleged harasser did not participate in decision to terminate plaintiff's employment).

156. The plaintiff is responsible for her termination from Chase in that she overstated her experience and potential, refused to accept management's contrary assessment, and declined the only position available at the time for which she was qualified.

157. The evidence shows Mr. Lafley, who did not know of the affair between plaintiff and defendant Ross, did not approve the higher salary increases recommended by defendant Ross. (See ¶ 28, *supra*). Further, the increases were pursuant to Chase's compensation guidelines. Therefore, there is no causal connection between the salary increases complained of and plaintiff's sexual relationship with defendant Ross.

158. Accordingly, plaintiff's claim of *quid pro quo* sexual harassment is dismissed in its entirety.

*Sexual Harassment*

*Hostile Environment*

159. To establish a claim for hostile environment, the plaintiff must show:

(a) The employee belongs to a protected class;

(b) The employee was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature;

(c) The harassment complained of was based upon sex;

(d) The harassment complained of affected a term, condition or privilege of employment; and

(e) Respondeat superior.

*Jones v. Flagship International,* 793 F.2d 714, 720 (5th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987), citing *Henson v. City of Dundee,* 682 F.2d 897, 909 (11th Cir.1982).

160. "The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 2406, 91 L.Ed.2d 49 (1986).

161. To be actionable, the sexual harassment must be so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment. *Meritor,* 106 S.Ct. at 2406. The plaintiff must show the conduct complained of would have interfered with a reasonable person's work performance and would have seriously affected a reasonable person's emotional well-being. Further, plaintiff must show she was actually offended by the conduct, and suffered some injury from it. *Rabidue v. Osceola Refining Co.,* 805 F.2d 611 (6th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987); *Highlander v. K.F.C. National Management Co.,* 805 F.2d 644, 650 (6th Cir.1986).

162. Plaintiff has not succeeded on her hostile environment sexual harassment claim because her affair with defendant Ross was welcomed. (See ¶¶ 103–104, *supra*).

163. Further, plaintiff failed to prove the incidents she alleged in her Complaint

actually occurred. (See ¶¶ 106, 114, *supra*). There was insufficient proof adduced that defendant Ross "treated (plaintiff) harshly and coldly on the job; spoke to her and about her in abusive and demeaning terms in front of her superiors, peers and subordinates; inundated her with meaningless clerical-level assignments for which he set unreasonable deadlines; denies (sic) her access to meetings; (sic) personnel and information she needed in order to carry out her assignments and then denigrated her for not carrying them out; divested her of much of her status and many of her responsibilities; ...." 2d Amended Cmplnt., P13.

164. For the reasons stated herein, plaintiff's claim as to hostile environment sexual harassment is dismissed in its entirety.

The parties are reminded Magistrate Dolinger's Confidentiality Order of May 25, 1984, remains in full force and effect.

All claims are dismissed and the Clerk is directed to enter judgment in favor of both defendants.

SO ORDERED.