**Marianne TROTTA, Plaintiff,**

**v.**

**MOBIL OIL CORPORATION, Defendant.**

**No. 90 Civ. 5663.**

United States District Court, S.D. New York.

April 8, 1992.

Carway & Flipse, Mineola, N.Y. (Adrienne Flipse, of counsel), for plaintiff.

Dechert Price & Rhoads, Philadelphia, Pa. (Mari Shaw, Michael J. Salmanson, of counsel), for defendant.

## OPINION & ORDER

EDELSTEIN, District Judge:

In this action, plaintiff Marianne Trotta ("Ms. Trotta" or "plaintiff") claims that Mobil Oil Corporation ("Mobil" or "the company" or "defendant") subjected her to a hostile work environment because of her sex in violation of Title VII, 42 U.S.C. § 2000e *et seq.* In support of her claim, plaintiff alleges that Mobil allowed sexually offensive conduct at mandatory business meetings and related social functions. According to plaintiff, these functions included the presence of female strippers and women clad in leather astride motorcycles, as well as the presentation of sexually suggestive gifts. In what plaintiff claims was "the last straw," one of her supervisors projected a slide of her backside on to a movie screen at a company outing. Plaintiff alleges that Mobil's sexually hostile work environment caused her to leave the company.

Mobil rejects plaintiff's contention that it fostered a sexually hostile work environment, and instead argues that plaintiff sued after a corporate reorganization affected her job prospects within the company. Mobil asserts that due to the reorganization, a promotion that plaintiff had wanted in New York would have required relocating to Fairfax, Virginia. When plaintiff refused to relocate, another woman received the promotion. In addition, the reorganization resulted in a transfer to Virginia of plaintiff's role in the budgeting process, which was her favorite part of the job. Noting that plaintiff actively pursued alternate employment opportunities before the slide show incident, defendant alleges that the effects of the corporate reorganization,

and not a supposedly hostile work environment, prompted plaintiff's resignation. Defendant contends that plaintiff collected the farrago of incidents alleged in this lawsuit after the fact, and that these incidents did not adversely affect her employment. Even if the incidents plaintiff complained of occurred as she described them, defendant claims that the incidents were not sufficiently severe or pervasive to constitute a hostile work environment under Title VII.

This Court conducted a bench trial of this action after which both sides submitted proposed findings of fact and conclusions of law. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the following constitutes this Court's findings of fact and conclusions of law.

## FINDINGS OF FACT

### I. Plaintiff's Employment History

Ms. Trotta is a female citizen of the United States who resides in Mamaroneck, New York. [Stipulated Fact ("Stip.") No. 1; Trial transcript ("Tr.") at 14]. During her employment at Mobil, which lasted from December 21, 1980 through August, 1988, she held several different positions and received a number of promotions. [Stip. No. 2]. From December 22, 1980 to May 1981, Ms. Trotta served as a Marketing Representative in Training at an annual salary of $21,000. [Stip. No. 3; Tr. at 15]. From May 1981 until February 1986, Ms. Trotta served as a Marketing Representative beginning at a grade level 9 and an annual salary of $24,130.54. During this period, she received salary increases each year and her grade level progressed to a level 12. [Stip. Nos. 4 & 5; Tr. 19–20]. From February 1986 to August 1988, Ms. Trotta served as an administrative supervisor in the Westchester/Connecticut Resale Sales District at a grade 13 salary level. [Stip. No. 6]. Ms. Trotta's last pay raise at Mobil was effective July 1, 1988, which gave her a salary of $44,500 per year. [Stip. No. 7].

Ms. Trotta's resignation from Mobil took effect on August 31, 1988. She left Mobil to work at Richter Properties Inc. ("Richter Properties") at a salary of $37,000. [Tr. at 97]. On March 31, 1989, Ms. Trotta left Richter Properties. On April 10, 1989, ten days later, Ms. Trotta started working at MCI Telecommunications Corp. ("MCI") as a Manager of Expense and Compensation at a salary of $45,000. [Stip. Nos. 38 & 39; Tr. at 14, 97]. Ms. Trotta testified at trial that her job at MCI has worked out well, and in April 1990, her salary increased to $48,600. [Tr. at 98, 122].

### II. Mobil's Reorganization and Ms. Trotta's Reaction

In February 1988, Mobil announced a reorganization of its Resale Division, where Ms. Trotta was then employed. [Stip. No. 10]. At the time of this announcement, the highest ranking person within the Westchester/Connecticut Resale Sales District was Judy Schultz, who served as the District Sales Manager. [Stip. No. 8]. It became Ms. Schultz's responsibility to explore job opportunities for all employees in the District whose jobs would be affected by the reorganization, and to discuss with each employee his or her options. [Tr. at 215].

Because Ms. Trotta's job was affected by the reorganization, Ms. Schultz met with Ms. Trotta on February 9, 1988, to discuss plaintiff's employment options. Also present at the meeting were Patricia Hepp, the Field Marketing Employee Relations Representative, and Reid Grimes, Ms. Trotta's immediate supervisor. [Stip. No. 11; Tr. at 57, 216, 268]. At the meeting, Ms. Trotta was offered two jobs: (1) a promotion to a grade 14 position in Fairfax, Virginia, or (2) a staff analyst position at her current salary and grade level in the Westchester/Connecticut District. [Stip. No. 12; Tr. at 57, 216, 273; Defendant's Exhibit ("Def.Exh.") 2].

While a final determination about the duties associated with each job had not been made, Ms. Schultz told Ms. Trotta that administrative budgeting, Ms. Trotta's favorite task, would be transferred to Fairfax, Virginia. Other parts of Ms. Trotta's job were to remain in the Westchester/Connecticut District. [Tr. at 216, 224, 234].

Ms. Trotta was unhappy with the prospect of employment as a grade 13 staff analyst in her district because of uncertainty over what the job would entail. She was not, however, willing to relocate to Fairfax to take a grade 14 job, and she indicated many times that she would not transfer to Fairfax. [Stip. Nos. 9 & 13; Tr. at 58–60]. Ms. Trotta's refusal to relocate limited her ability to obtain a promotion. [Tr. at 201–22].

At the February 9, 1988 meeting, Ms. Trotta inquired whether she could resign her position at Mobil and take a severance package. [Tr. at 108]. Ms. Hepp advised Ms. Trotta that, pursuant to Mobil policy, she would not be entitled to severance pay upon resigning because she had been offered a position at Mobil. [Tr. at 109; Def.Exh. 2, 14].

Ms. Trotta became further aggravated about her employment situation after attending a meeting with Terry McKenna, her supervisor and the District Administrative and Controls Manager, on July 27, 1988. At this meeting, Ms. Trotta learned that Ms. Schultz had offered another female, Cindy Vallorani, a grade 14 position within the district. [Stip. No. 15; Tr. at 74–75]. Then, in meetings on July 27 and 29, 1988, Ms. Trotta told Mr. McKenna of her displeasure over Ms. Vallorani's grade 14 position because she felt that Ms. Vallorani was receiving a promotion to a higher level while performing the same job as Ms. Trotta. [Stip. No. 31]. Mr. McKenna explained to Ms. Trotta that Ms. Vallorani's job was not identical to plaintiff's job because Ms. Vallorani's job entailed a transfer to Mobil's headquarters in Fairfax, Virginia within 18 months to two years. [Stip. No. 32; Tr. at 59, 74]. In that same conversation with Mr. McKenna, Ms. Trotta reiterated her lack of interest in relocating to Fairfax. [Tr. at 110]. Ms. Vallorani did in fact relocate, initially to Fairfax, Virginia and then to Dallas, Texas. [Tr. at 218].

As a result of the reorganization and the substance of discussion at the February 9, 1988 meeting, which left Ms. Trotta unhappy with her job opportunities within Mobil, Ms. Trotta immediately started looking for other employment. [Tr. at 109]. During the Spring of 1988, she actively pursued other employment with the help of several employment agencies. [Stip. No. 14; Tr. at 111]. Ms. Trotta gave the employment agencies a copy of her resume, explained the reorganization and downsizing at Mobil, and requested that they identify job opportunities outside the company. [Tr. at 60]. In a letter dated April 10, 1988, Ms. Trotta wrote to PepsiCo seeking employment. In the letter, Ms. Trotta explained that "Mobil Oil is continuing to consolidate, thus severely limiting advancement opportunities. For this reason I have begun to look elsewhere." [Tr. at 111; Def.Exh. 3]. Ms. Trotta accepted the first job offer she received from another company. [Tr. at 109].

### III. The Atlantic City Outing, Scavenger Hunt, and Slide Show

In July, 1988, before Ms. Trotta obtained a job outside Mobil, the Westchester/Connecticut District sponsored an outing in Atlantic City, New Jersey. [Stip. No. 16]. Ms. Trotta described the event as a district function designed to entertain and amuse employees. [Tr. at 62]. Almost all of those attending the outing travelled to Atlantic City in a chartered bus that departed from Greenwich, Connecticut. Ms. Trotta, however, drove to Atlantic City in her own car. [Stip. No. 17].

One event at the outing was a group scavenger hunt. Participants in the scavenger hunt divided into teams, each of which received a camera to take pictures of the event. Ms. Trotta did not object to the scavenger hunt. In fact, she participated in it. [Stip. No. 19; Tr. at 112]. At the end of the scavenger hunt, Jack Whalen, one of Ms. Trotta's scavenger hunt teammates, was returning to a restaurant with other members of his team in order to hand in the team's scavenger hunt items. As other Mobil employees walked down the boardwalk in front of him, he noticed one picture left in the team's camera and took a picture. [Tr. at 236].

The picture shows Ms. Trotta from behind, from her neck down to her feet. In

the picture, Ms. Trotta is seen carrying the scavenger hunt list and a gym bag filled with items collected from the scavenger hunt. Ms. Trotta is fully clothed in the picture, and the only skin showing is the skin of her arms where the sleeves end. The picture also includes part of another co-worker, teammate Dave Driscoll, approximately from his waist down to his feet. [Plaintiff's Exhibit ("Pl.Exh.") 1–B; Tr. at 114–15, 235–37].

Mr. Whalen put the pictures in the team bag with other pictures of the scavenger hunt. He did not know at the time, nor could he have known, that the pictures would be converted into slides. [Tr. at 237]. It was only after the scavenger hunt that Ms. Schultz had the idea to convert pictures taken during the scavenger hunt into slides to be shown at a dinner during the outing. [Stip. No. 20]. After reviewing her own team's pictures, Ms. Schultz thought it would be fun for everyone at the outing to view the pictures. [Tr. at 219]. Ms. Schultz had not seen any photographs of Ms. Trotta, or any photographs taken by other teams, when she suggested to Mr. McKenna that they convert scavenger hunt pictures into slides. [Tr. at 219].

Mr. McKenna and another district employee, Maury Billig, went through the photographs of the scavenger hunt and removed those pictures that did not depict people, such as pictures of a telephone pole and the sky. [Tr. at 250]. They sent the remaining pictures to a camera shop to be converted into slides. Mr. McKenna did not direct the camera shop to alter the pictures in any way, and did not examine the slides when they came back from the camera shop. [Tr. at 251]. Mr. McKenna hoped that the slides would depict all the activities and participants involved in the scavenger hunt so that collectively the slides would capture the flavor and spirit of the event. [Tr. at 261]. In addition, Mr. McKenna and Mr. Billig included pictures of themselves working with hotel staff, cooks, housekeepers, and bellhops. [Tr. at 251].

Although Ms. Trotta learned that a photograph of her had been converted into a slide, she did not ask to see the slide before the slide show, nor did she request that the slide not be shown. [Tr. at 112–13, 251].

The slides were shown as part of the entertainment after dinner on Thursday night, July 21, 1988. Mr. McKenna provided commentary to accompany the slides. [Stip. No. 22]. One of the slides shown was the picture Mr. Whalen had taken of Ms. Trotta. The slide was not an exact duplicate of the picture, but had been cropped significantly on the top and bottom, and slightly on the sides. [Tr. at 239].

There is conflicting testimony about what happened when the slide of Ms. Trotta was shown. Ms. Trotta testified that before Mr. McKenna projected the slide on the screen, he said that it was a slide taken the day of the scavenger hunt, and he thought the group would find it amusing. According to Ms. Trotta, Mr. McKenna added, "[t]his is a rear view of Marianne Trotta." [Tr. at 251]. Mr. McKenna testified that he did not comment on the slide or identify the person in the slide as Ms. Trotta. [Tr. at 252]. Ms. Hepp, who was present at the slide show, testified that Mr. McKenna did not identify Ms. Trotta. [Tr. at 272]. Ms. Hepp stated that she was unable to identify the person in the slide when it was shown and had to ask someone sitting next to her the identity of the person in the slide. [Tr. at 272].

Given the irreconcilable versions of events, this Court must determine whether to credit Ms. Trotta's testimony or Mr. McKenna's and Ms. Hepp's testimony. Ms. Trotta's testimony was sketchy about many events. Rather than testifying candidly about events she observed, Ms. Trotta often made general conclusory statements. Ms. Trotta's testimony about the slide show was uncorroborated. Mr. McKenna and Ms. Hepp were candid witnesses who gave credible testimony. In addition, Mr. McKenna's and Ms. Hepp's testimony about the slide show corroborate each other. I therefore credit Mr. McKenna's and Ms. Hepp's version of events.

The slide of Ms. Trotta was shown for a few seconds. [Tr. at 239]. Ms. Trotta stayed for the entire slide show, during

which she laughed at various slides, including those shown after the one of her. [Tr. at 239–40, 243]. Ms. Trotta did not talk to Mr. McKenna, Ms. Hepp, or Ms. Schultz about the slide the evening it was shown. [Tr. at 115–16]. Ms. Trotta testified that she left Atlantic City that evening because she was too upset to stay. Plaintiff admitted, however, that even before the slide show she planned on leaving Atlantic City that evening. [Tr. at 89–90].

## IV. After the Slide Show

On Monday, July 25, 1988, Ms. Trotta complained to Mr. McKenna about the slide presentation. [Stip. No. 24]. Ms. Trotta told Mr. McKenna that she did not appreciate the slide of her and asked that he give her both the slide and picture. [Tr. at 253]. Mr. McKenna told Ms. Trotta that he was sorry, and that he did not mean to embarrass her in any way. Mr. McKenna then gave her both the slide and the picture, and apologized again. [Tr. at 117–18, 252–53].

When Ms. Schultz telephoned the office that day, she was told by Mr. McKenna that Ms. Trotta had asked for and received the slide and the picture of her. [Tr. at 220]. Because at the time Ms. Schultz did not remember the slide of Ms. Trotta, she asked Mr. McKenna to have a picture developed from the negative so that she could see the picture upon returning to the office that week. [Tr. at 220]. Upon her return, she received a detailed account from Mr. McKenna about his meeting with Ms. Trotta. Although Ms. Schultz asked Mr. McKenna for a copy of the picture, Mr. McKenna could not produce one because there was no negative. [Tr. at 221].

Although Ms. Trotta had in the past lodged complaints with Employee Relations, she never registered any objection to the slide show incident. [Tr. at 118]. In explaining her decision not to register a complaint, Ms. Trotta testified that she did not call Employee Relations because an Employee Relation's Representative, Ms. Hepp, was present at the outing. [Tr. at 118]. Ms. Trotta, however, also testified that she could have called other Mobil employees to complain about the incident. [Tr. at 118].

Ms. Trotta also testified about two separate exchanges she had with fellow employees. She testified to having had two phone conversations with two male co-workers after the Atlantic City event. One told her not to worry about the slide show, that he thought she "looked great" and "was very sexy." [Tr. at 77–78]. Ms. Trotta testified that she told the co-worker that she was upset about the slide and did not want to discuss it. [Tr. at 77]. According to Ms. Trotta, another male co-worker told her he thought the photograph was great because "he liked round people, he was round himself." [Tr. at 78]. According to Ms. Trotta, any discussion about the slide died down by August—before she received a job offer from Richter Properties and before she submitted her resignation. [Tr. at 119].

## V. Ms. Trotta's Resignation

Although Ms. Trotta began looking for a job immediately after the February 9, 1988 meeting with Ms. Schultz, Ms. Trotta did not tender her resignation until she found another job. [Tr. at 93]. This occurred on August 15, 1988, when Ms. Trotta received a job offer from Richter Properties. [Stip. No. 25; Tr. at 93]. This offer was the first one that Ms. Trotta had received since she began looking for another job in February 1988. Four days later, on August 19, 1988, Ms. Trotta submitted her resignation to Ms. Schultz, effective August 31, 1988. [Stip. No. 26; Tr. 79; Pl.Exh. 12].

In her resignation letter, Ms. Trotta first complained about "recent personnel changes within the company in general, and the District in particular." [Stip. No. 27; Pl.Exh. 12]. Ms. Trotta admitted that this complaint referred to Ms. Vallorani. [Tr. at 119–20]. Plaintiff also complained that her position in the district was "grossly undervalued." [Stip. No. 28; Tr. at 81]. This complaint also referred to Ms. Vallorani. [Stip. No. 30]. At trial, Ms. Trotta admitted that she resigned in part because of her displeasure with Ms. Vallorani's promotion. [Tr. at 82].

In her resignation letter, Ms. Trotta made it clear that she disagreed with the Mobil policy that conditioned certain promotions on a willingness to relocate. Ms. Trotta stated "[i]t apparently suits management to punish employees who do not wish to relocate by giving them ever increasing responsibility without a corresponding increase in group level." [Stip. No. 33; Tr. at 110]. Although in the letter Ms. Trotta did mention her disgust with Mobil business meetings which, Ms. Trotta asserted, were merely excuses to overdrink and misbehave, she did not contend that these meetings prompted her resignation, nor did she claim ever to have been sexually harassed. [Stip. No. 29; Pl.Exh. 12]. Ms. Trotta did not mention the Atlantic City outing or the slide show incident in the resignation letter. [Pl.Exh. 12].

Upon submitting her resignation letter, Ms. Trotta testified that she told Ms. Schultz that the Atlantic City function was an example of the way Mobil used funds so that people could "drink and drink and overdrink and act inappropriately" at meetings. [Tr. at 81]. Before submitting her resignation, Ms. Trotta had never complained to Ms. Schultz about sexual harassment. [Tr. at 221].

## VI. The Environment at Mobil

In this action, Ms. Trotta attempted to link isolated incidents of alleged sexual harassment, which allegedly occurred during her seven and one half year tenure at Mobil, to her resignation. Ms. Trotta claimed that these incidents were sufficiently severe and pervasive to create a hostile work environment and alter the conditions of her employment. Ms. Trotta testified to the following eleven incidents, listed here in chronological order: (1) in 1981, women scantily clad in leather astride motorcycles were present at a regional meeting; (2) in 1982, a slide of a woman's silhouette was shown at a business meeting; (3) in 1983, strippers performed at a sales review meeting held in a bar and grill; (4) in 1984, when Ms. Trotta, who had not been feeling well at a meeting, said at a cocktail party afterward that she was not feeling better, a male Mobil employee said that she could go up to his room and he would "make [her] feel better;" (5) in 1985, suggestive gifts were given to a woman and another unidentified person at a going away party; (6) in 1985, at a softball game in Westchester, male employees fed a female employee drinks until she could not stand up; (7) in 1986, two strippers performed at a meeting in Brooklyn; (8) in December 1987, at a Christmas party in Connecticut, a male employee kissed a woman's neck and bit her back; (9) a Mobil employee had taken a picture of a male employee's buttocks as he fell from a canoe; (10) in July 1988, in Atlantic City, a slide of Ms. Trotta's backside was shown at company dinner; and (11) male employees made comments to her about the slide show after the outing. Of these eleven alleged instances, only three were directed at Ms. Trotta herself. The other eight are alleged to have contributed to the hostile work environment at Mobil.

### A. Incidents Directed at Ms. Trotta

#### 1. Slides

While Ms. Trotta may have felt embarrassed by the slide show incident, neither taking the picture nor showing the slide constituted sexual harassment or contributed to a sexually hostile work environment. The picture of Ms. Trotta was taken on the way back from the scavenger hunt, and shows her carrying the list of items involved in the hunt and a bag of items collected from the hunt. The picture was intended to capture the spirit of the scavenger hunt and was not intended to embarrass or humiliate Ms. Trotta because she is a woman.

Ms. Trotta attempted to show that the allegedly unflattering photograph of her was not an isolated event. Ms. Trotta testified that she saw another photograph, this one of a male marketing representative, who "lost his pants" when he tipped over a canoe at a company outing during the summer of 1987. Although Ms. Trotta did not attend that outing, she claimed to have seen the photograph some months later after the picture had been made into a slide and presented to a group. Mr. Trotta

testified that the picture depicted a man's "rear end with his buttocks exposed." [Tr. at 54–55]. According to Ms. Trotta, the male employee in the picture was very sensitive about his weight and was upset by the photograph. [Tr. at 55].

Although Ms. Schultz, who was present at the scene, testified that the gentleman did in fact "lose his pants," the only photograph of that male marketing executive tipping over in a canoe did not show his buttocks exposed. [Def.Exh. 9; Tr. at 212–14, 221–22]. The photograph was taken by Sue Hayden, who was responsible for taking pictures at that event. [Tr. at 212, 221–22]. She took the picture at the beginning of a canoe race when all three canoes in the race tipped over.

Ms. Trotta testified that when the photograph of her was taken at the scavenger hunt, she was 5′1″ and weighed approximately 163 pounds. [Tr. at 79–80]. Ms. Trotta testified that she now weighs approximately 119 pounds. [Tr. at 80]. While Ms. Trotta and the male employee in the canoe race may have been sensitive about their weight and embarrassed by the slides, the photographs were not taken and the slides were not shown to humiliate them because of their gender. After considering the testimony at trial, I find that the slide of Ms. Trotta was taken and displayed at the company outing in an attempt to capture the spirit of the scavenger hunt and not with the intent to humiliate or embarrass Ms. Trotta either because she is a woman or because of her weight.

Ms. Trotta described the slide show incident as the main instance of sexual harassment that compelled her to leave Mobil. [Tr. at 25]. Even if Ms. Trotta was embarrassed by the slide show incident, it did not constitute an instance of sexual harassment.

### 2. Comments About the Slide

Ms. Trotta testified to having two phone conversations with two male co-workers after the outing. One told her not to worry about the slide show, that he thought she "looked great" and "was very sexy." [Tr. at 77–78]. Ms. Trotta testified that she told the co-worker that she was upset about the slide and did not want to discuss it. [Tr. at 77]. According to Ms. Trotta, another male co-worker told her he thought the photograph was great because "he liked round people, he was round himself." [Tr. at 78]. Ms. Trotta did not place these conversations in context. According to her testimony, Ms. Trotta initiated at least two conversations about the slide. [Tr. at 77]. Ms. Trotta's testimony about these conversations lacked corroboration and neither of the alleged commentators was called to testify. Given Ms. Trotta's often vague testimony, it is difficult for the Court to credit her testimony on this point.

### 3. The 1984 Incident

Other than the slide incident and comments that followed, Ms. Trotta testified to only one other incident directed at her. That incident allegedly took place in 1984—four years before Ms. Trotta's resignation—and Ms. Trotta remembered it for the first time at trial in response to leading questions by her attorney. At trial, Ms. Trotta testified that in 1984, she attended a sales review meeting in Long Island. After the meeting, at a cocktail party, Ms. Trotta told several Mobil employees that she was not feeling well. [Tr. at 34]. At that point, a male Mobil employee said that if she was not feeling well, she should "go up to his room and he could make [her] feel better." [Tr. at 35].

Despite being asked at her deposition on January 21, 1991 to recall all of the alleged incidents of sexual harassment that resulted in her decision to resign, [Tr. at 99–100, 124], she did not testify at the deposition about the 1984 incident. In fact, Ms. Trotta also testified at her deposition that the first incident of any supposed sexual harassment directed at her was the slide show in July of 1988. [Tr. at 98–99].

This is the most direct and blatant incident of sexual harassment Ms. Trotta described at trial. Accordingly, it is difficult for this Court to believe that Ms. Trotta could not remember it until the day of trial. Given Ms. Trotta's failure to remember this incident until the day of trial, her obvious

interest in bolstering her case, and her generally sketchy testimony, I do not find Ms. Trotta's testimony regarding this incident credible.

### B. Indirect Incidents

#### 1. 1981 Regional Meeting

Ms. Trotta testified that present at a 1981 regional meeting with a Western theme were scantily clad women in black leather outfits astride motorcycles on top of tables. [Tr. at 26, 136]. Cherisse Texidor, a co-worker who testified on behalf of Ms. Trotta, testified that there was only one such woman at the event, who was "on [a] motorcycle dressed in leather, reclining back on the seat, legs spread apart." [Tr. at 137]. Tulio Lopez, another witness to the event, testified on behalf of Ms. Trotta that a woman on a motorcycle was present at the meeting, but that the motorcycle was not on a table. [Tr. at 197]. Mr. Lopez did not recall the woman's attire. [Tr. at 197–98].

This Court finds that there was a woman on a motorcycle at the 1981 regional meeting. Nevertheless, given the different version of events recounted by Ms. Trotta and Ms. Texidor, the bias of Ms. Trotta, and the often incredible testimony of Ms. Texidor, this Court is unable to determine exactly what transpired at this meeting. Clearly, if the presence of the woman tended to objectify women, as the testimony of Ms. Trotta and Ms. Texidor suggest, this type of incident could contribute to a hostile working environment. Standing alone, however, it is not sufficiently severe in this case to constitute sexual harassment.

Ms. Trotta testified that she complained to Employee Relations about the motorcycle incident, and that as a result of her complaint, no similar incident occurred. [Tr. at 101–02].

#### 2. Slide of Woman's Silhouette

Ms. Trotta testified that a regional manager projected a slide of a woman's silhouette on a screen during a presentation in 1982 and said, "Gee folks, I'm sorry, I didn't realize that this was in here, but since it is, it is kind of funny." Ms. Trotta testified that she complained to Employee Relations about this incident, that Employee Relations discussed it with the regional manager, and that Employee Relations had taken the action Ms. Trotta wanted taken. [Tr. at 100–01].

#### 3. Strippers

Ms. Trotta testified that in 1983 she observed strippers at a sales review meeting in a bar and grill. [Tr. at 36, 106]. Ms. Trotta also testified that at the end of another meeting, which took place in 1986, she personally observed two strippers, but on cross-examination she admitted not to have been present when the event allegedly occurred. [Tr. at 41–42, 105–06]. The 1986 meeting that Ms. Trotta mentioned may have been the same meeting described by Ms. Texidor in her testimony. [Tr. at 140–41]. Ms. Texidor, however, testified that one stripper, not two, performed at this meeting. [Tr. at 140]. Ms. Texidor testified that Ms. Trotta did not attend the meeting. [Tr. at 141]. Although Ms. Texidor testified that she told Ms. Trotta about the stripper, there is no evidence that Ms. Trotta knew of this incident at the time of her resignation. Ms. Trotta did not recall hearing about other incidents involving strippers. [Tr. at 51].

#### 4. Suggestive Gifts

Ms. Trotta testified that in 1985, during a going-away party for a woman, Diane Russo, people gave Ms. Russo and another unidentified person "very suggestive gifts." [Tr. at 37]. Ms. Trotta did not testify whether Diane Russo or other persons considered the gifts unwelcome or who gave the gifts.

#### 5. Softball Game

At one point during the trial, Ms. Trotta testified that in 1985, during a softball game, a group of area managers "did their best to insist" that a female area manager "be like the men and drink like them." [Tr. at 38]. Ms. Trotta, however, gave inconsistent testimony on this point at trial. Ms. Trotta testified at trial that: (1) the male co-workers "kept feeding [the area manag-

er] drinks until she was so drunk that she couldn't stand up," [Tr. at 38–39]; (2) she saw people pouring liquor down the area manager's throat, [Tr. at 104]; and (3) when she complained to Tulio Lopez, she told him that the area manager was "force fed liquor." [Tr. at 52]. But in earlier testimony at trial, before her attorney posed leading questions concerning this incident, Ms. Trotta testified that the area manager was not forced to drink. [Tr. at 38]. Further, at her deposition, Ms. Trotta testified as follows:

Q. What do you mean, deliberately tried, I mean, did they pour liquor down her throat or did they buy her drinks? A. They kept buying her drinks. No they didn't pour liquor down her throat. They just kept, they made an environment for her where she was ... I guess she had difficulty dealing with. She later had too much to drink.

[Tr. at 104]. Ms. Trotta's deposition testimony is more credible than her conflicting trial testimony on this issue.

### 6.  *1987 Christmas Party*

Ms. Trotta testified that in December, 1987, at a Christmas party at the Danbury Hilton, an area manager, who was "extremely, extremely drunk," bit a female engineering analyst on the back while trying to kiss her. [Tr. at 40–41]. Ms. Trotta testified that Mr. Whalen was present at this incident [Tr. at 40]. Mr. Whalen testified that although he was present at the meeting, he did not observe the female engineering analyst being bitten. [Tr. at 233]. Ms. Trotta testified that the area manager apologized to the engineering analyst after Ms. Trotta reported the incident to her supervisor. [Tr. at 105].

### C.  Other Incidents

Ms. Trotta produced two witnesses, Ms. Texidor and Roseanne Favaro, who testified about other incidents at Mobil that allegedly contributed to producing a hostile work environment. Ms. Trotta, however, did not testify to an awareness of these incidents at the time she resigned from Mobil. Therefore, even if true, these inci-

dents did not affect the conditions of Ms. Trotta's employment.

Even where relevant, Ms. Texidor's testimony was for the most part wholly lacking in credibility. She greatly exaggerated the incidents she related to the Court. [Tr. at 163]. Furthermore, Ms. Texidor was evasive even when testifying about such matters as whether she was employed at Mobil, the performance problems she had while at Mobil, and the accuracy of Mobil business forms. [Tr. at 164, 165, 166–69, 170–72].

Ms. Favaro testified to two incidents. First, Ms. Favaro testified that at an annual meeting held at a hotel, young male Mobil employees "trashed a room" when they "brought garbage from a dumpster and they scattered it around the room, a sleeping room, not a meeting room." [Tr. at 181]. There was no testimony that Ms. Trotta knew of this incident. Even if she did, this incident reveals immature and senseless behavior of a non-sexual nature. Second, Ms. Favaro testified that she attended a Mobil Christmas party with Ms. Trotta where a male stripper dressed like Santa Claus and a female stripper dressed like Mrs. Claus performed a striptease. [Tr. at 183–84]. While Ms. Favaro testified that Ms. Trotta was present during the striptease, Ms. Trotta did not testify that she observed or even knew about this incident.

### VII.  *Mobil's Policy Against Sexual Harassment*

Mobil has a policy against sexual harassment. Tulio Lopez, Ms. Trotta's supervisor from 1981–1986, testified that he attended seminars offered by Mobil almost every year on sexual harassment [Tr. at 203–04]. Mr. Lopez also recalled receiving a Mobil management guide, effective April 1, 1981, addressing sexual harassment. [Pl. Exh. 3; Tr. at 204].

Among other things, the management guide: (1) sets forth the Equal Employment Opportunity Commission's ("EEOC") regulations defining sexual harassment; (2) charges managers and supervisors with communicating Mobil's policy that "harass-

ment of any kind will not be tolerated at any level" to employees; (3) establishes a complaint procedure whereby complainants can make a claim either to their supervisors or Employee Relations; (4) sets forth Mobil's policy ensuring that an employee will not suffer retaliation for lodging a harassment charge; and (5) makes clear that appropriate disciplinary action will result, including reprimand, suspension or discharge, against anyone violating the policy. [Pl.Exh. 3].

Mr. Lopez also testified that he received a document outlining how to conduct an EEOC workshop on sexual harassment, the stated objective of which was to have participants: understand the meaning of sexual harassment and its potential liabilities, be aware of some form of implicit as well as explicit occurrences of sexual harassment, know Mobil's policy regarding sexual harassment, and know what actions may be taken in the event a charge of sexual harassment arose. [Pl.Exh. 5].

The policy was also outlined in a statement dated January 14, 1985, from R.G. Weeks, Executive Vice President of the United States Marketing and Refining Division. The statement once again set out the EEOC's definition of sexual harassment and the procedure for reporting such incidents, as well as the penalties for engaging in sexual harassment. [Def. Exh. 12A].

Mr. Whalen, who was a marketing representative in the Westchester/Connecticut sales district in July 1988, also testified about Mobil's policy regarding sexual harassment. Mr. Whalen said he attended a company sponsored presentation on sexual harassment when he was training as a marketing representative. [Tr. at 230]. Mr. Whalen testified that Jim Texada, an employee relations advisor, told the trainees that it was Mobil's policy to provide an environment free of sexual harassment. [Tr. at 230–31].

Mr. Whalen also testified that when he worked as a retail training advisor, his responsibilities included presenting sexual harassment seminars to new management candidates and independent dealer candidates. [Tr. at 231]. In these seminars, Mr.

Whalen told the candidates that Mobil did not tolerate sexual harassment. He also told them that if they felt an incident of sexual harassment occurred, they should report it to their supervisor or, if they felt uncomfortable doing so, their supervisor's supervisor, or employee relations. [Tr. at 231]. Mr. Whalen told the management candidates that if they were involved in an incident of sexual harassment they would receive counseling, and, if their behavior continued, would be subject to termination. [Tr. at 232]. Mr. Whalen also testified that he had seen the statement from R.G. Weeks. [Def.Exh. 12A].

Ms. Trotta was aware of Mobil's policy on sexual harassment, and she availed herself of its remedial provisions. When she made complaints to her supervisors or employee relations, they responded and took effective remedial actions. [Tr. at 29, 46, 53, 100–02, 105].

## VIII. The Incidents That Occurred and Ms. Trotta's Reason For Leaving Mobil

Ms. Trotta and the witnesses she called on her behalf testified to a number of incidents that allegedly contributed to a hostile work environment. This Court has found that some of these incidents did not occur at all, and that Ms. Trotta did not know of others before her resignation from Mobil. Accordingly, in addressing Ms. Trotta's claim, this Court will consider only the following incidents: (1) in 1981, a woman on a motorcycle was present at a regional sales meeting; (2) in 1982, a regional manager projected a slide of a woman's silhouette on to a screen at a business meeting; (3) in 1983, strippers performed at a meeting held at a bar and grill; (4) in 1985, suggestive gifts were given to a woman at a farewell party; (5) in 1985, at a softball game in Westchester, male employees bought a female employee drinks until she got very drunk; (6) in December 1987, at a Christmas party in Connecticut, a male employee kissed a woman's neck and bit her back; (7) a picture was taken of a male employee falling from a canoe at a company event; and (8) in July 1988, the slide

show incident occurred in Atlantic City and two male employees made comments to Ms. Trotta following the slide presentation. These incidents are wholly inappropriate in the workplace of an employer committed to a policy prohibiting sexual discrimination. The issue, however, is not whether these incidents were inappropriate. Rather, the issues are whether these incidents altered the conditions of Ms. Trotta's employment and whether they were sufficiently severe or pervasive to create a hostile work environment.

While Ms. Trotta found these incidents undesirable and offensive, she has failed to show that they altered the conditions of her employment. Although Ms. Trotta was upset when she left Mobil, her consternation did not stem from the alleged sexually hostile environment. Ms. Trotta was upset that her refusal to relocate limited her opportunities for promotion; she was upset that Ms. Vallorani received a promotion; she was upset over the transfer to Virginia of administrative budgeting, her favorite part of her job; and, she was upset with the uncertainty that accompanied Mobil's reorganization. Although Ms. Trotta contends that the incidents complained of here created an environment so hostile that she was forced to leave Mobil, Ms. Trotta did not resign because of these incidents. She left Mobil because of her dissatisfaction over her opportunities within the company and her position after the company's reorganization. Ms. Trotta would have resigned whether or not the events that allegedly created a sexually hostile work environment occurred.

While these incidents, spanning seven and one-half years, could contribute to a hostile work environment, Ms. Trotta has failed to show that they were sufficiently severe or pervasive to constitute a hostile work environment in this case. Few of the incidents were directed at Ms. Trotta and most were separated in time by approximately a year, and in some instances by two years. In addition, Ms. Trotta testified that her supervisors or Employee Relations addressed her complaints when she raised them.

In sum, these incidents did not alter the conditions of Ms. Trotta's employment or create an abusive working environment. A reasonable person in Ms. Trotta's position would not have felt that there was a sexually hostile environment at Mobil. Ms. Trotta did not feel compelled to resign, nor would a reasonable person in Ms. Trotta's position feel compelled to resign, because of the incidents that occurred during her tenure at Mobil. Neither Ms. Schultz nor Mobil discriminated against Ms. Trotta on the basis of her gender.

## IX.  Mobil's Offer of Re-employment and Ms. Trotta's Departure

After Ms. Trotta's resignation from Mobil, she received two offers for re-employment. The first came from Ms. Hepp and Rich Martinez, another Employee Relations Representative, who asked Ms. Trotta to reconsider her decision and offered to try and transfer Ms. Trotta to another job within the New York area. [Stip. No. 34]. On August 30, 1988, Mr. Martinez offered Ms. Trotta a transfer to a job in a different location working with different people. [Tr. at 120].  Ms. Trotta rejected this offer. [Tr. at 121].

The second offer for re-employment came after Ms. Trotta wrote letters to several Mobil managers about the circumstances surrounding her resignation. In response, in a letter dated September 15, 1988, T.C. DeLoach, vice-president of Marketing, offered Ms. Trotta the opportunity to return to Mobil in a resale position in the same general geographic area and at the same level. Mr. DeLoach further advised Ms. Trotta to contact Mr. Martinez if she had any interest in accepting the offer. [Stip. No. 35]. Ms. Trotta never contacted Mr. Martinez. [Stip. No. 36].

Upon leaving Mobil, Ms. Trotta was employed by Richter Properties as an Administrative and Budgets Manager at a salary of $37,000. [Stip. No. 37]. In a letter to Mr. Baskin, she wrote that the job provided her with a "good opportunity" to work in the financial area, where she always wanted to be. [Tr. at 121].

## CONCLUSIONS OF LAW

■ Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). In *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court held that sexual harassment constitutes sex discrimination in violation of Title VII. Courts have recognized that two forms of sexual harassment violate Title VII's prohibitions: (1) *quid pro quo* sexual harassment, and (2) sexual harassment based on a "hostile environment." *See Kotcher v. Rosa*, 957 F.2d 59, 62 (2d Cir.1992); *Carrero v. New York City Housing Auth.*, 890 F.2d 569, 577 (2d Cir.1989). In *quid pro quo* cases, employers violate Title VII by conditioning employment benefits on yielding to sexual demands. *Vinson*, 477 U.S. at 64–65, 106 S.Ct. at 2404–05. In "hostile environment" cases, the employer's conduct " 'has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.' " *Vinson*, 477 U.S. at 65, 106 S.Ct. at 2404 (quoting 29 C.F.R. § 1604.11(a)(3) (1985)).

■ Plaintiff does not allege *quid pro quo* sexual harassment, and no *quid pro quo* sexual harassment occurred in this case. Rather, plaintiff has premised her claim on a hostile work environment theory. The Second Circuit has stated that in a hostile work environment action, "[a] complaining employee is required to prove that ... [the] conduct [at issue] was unwelcome, that the conduct was prompted simply because of the employee's gender, and that the conduct was sufficiently pervasive to create an offensive environment antithetical to the priority of merit—not sex or some other prohibited criterion—in the workplace." *Carrero*, 890 F.2d at 578; *see Kotcher*, 957 F.2d 59, 62. Thus, in order to prevail under a hostile work environment theory, an employee must show that: (1)

the employee was a member of a protected class; (2) the employee was subjected to unwelcome harassment; (3) the harassment was prompted simply because of the employee's gender; (4) the charged harassment affected a term, condition or privilege of employment; and (5) the existence of respondeat superior liability. *See Jones v. Flagship Int'l*, 793 F.2d 714, 719–20 (5th Cir.1986), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987); *Henson v. City of Dundee*, 682 F.2d 897, 903–05 (11th Cir.1982); *Danna v. New York Telephone Co.*, 752 F.Supp. 594, 609–610 (S.D.N.Y.1990); *Fair v. Guiding Eyes For the Blind, Inc.*, 742 F.Supp. 151, 155 (S.D.N.Y.1990); *Bennett v. New York City Dept. of Corrections*, 705 F.Supp. 979, 984 (S.D.N.Y.1989); *Koster v. Chase Manhattan Bank*, 687 F.Supp. 848, 862 (S.D.N.Y. 1988). Ms. Trotta has failed to show that the conduct at issue affected a term, condition, or privilege of employment. She has also failed to demonstrate the existence of respondeat superior liability.

### I. Protected Group

■ The requirement that the plaintiff belong to a protected group in a sexual harassment case under Title VII is satisfied if there is a stipulation between the parties that the plaintiff is either a man or a woman. *See Jones*, 793 F.2d at 719–20; *Henson*, 682 F.2d at 903–05. The parties have stipulated that plaintiff, Marianne Trotta, is a woman, and therefore she is a member of a protected class. [*See* Stip. No. 1].

### II. Unwelcome Sexual Harassment

"The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.' " *Vinson*, 477 U.S. at 68, 106 S.Ct. at 2406; *see Henson*, 682 F.2d at 903; *Koster*, 687 F.Supp. at 861. For the conduct in question to be deemed harassment, "the conduct must be unwelcome in the sense that the employee regarded the conduct as undesirable or offensive." *Henson*, 682 F.2d at 903. Ms. Trotta found the conduct complained of in this action undesirable and offensive. Her distaste for this conduct, however, is not dispositive of the issues of whether the

conduct altered the conditions of her employment or was sufficiently severe and pervasive to create a hostile working environment.

### III. Harassment Prompted By Gender

Many courts have required that the alleged harassment take the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature. *See Jones,* 793 F.2d at 719–20; *Henson,* 682 F.2d at 903–05. Some courts, however, have held that the alleged conduct need not be sexual. *See Andrews v. City of Philadelphia,* 895 F.2d 1469, 1485 (3rd Cir.1990); *Hall v. Gus Constr. Co., Inc.,* 842 F.2d 1010, 1014 (8th Cir.1988). In stating the essential elements of a Title VII sexual harassment claim, the Second Circuit has stated that a "complaining employee is required to prove ... that the conduct was prompted simply because of the employee's gender." *Carrero,* 890 F.2d at 578; *see Fair,* 742 F.Supp. at 156. Thus, the conduct underlying a sexual harassment claim need not be sexual in nature as long as the conduct is directed at the employee because of his or her sex. Adopting such a standard recognizes that "intimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances." *Hall,* 842 F.2d at 1014. Further, such a standard is consistent with Title VII's purpose of affording "employees the right to work in an environment free from discriminatory intimidation, ridicule and insult." *Vinson,* 477 U.S. at 65, 106 S.Ct. at 2405; *see, e.g., Andrews,* 895 F.2d at 1485 ("the pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees may serve as evidence of a hostile environment").

Of the incidents that occurred in this case, some of the conduct was sexual in nature, while other conduct was not. The woman on the motorcycle, the slide of a woman's silhouette, the strippers, the suggestive gifts, and a male Mobil employee kissing and biting a female employee were incidents of a sexual nature. In addition, the comments made to Ms. Trotta by two male employees about the slide of her shown at the Atlantic City outing were sexual in nature. The incident at the softball game in 1985, where male employees got a female employee drunk, was not sexual. It was, however, directed at the female employee because of her sex.

The slides of Ms. Trotta returning from the scavenger hunt and of the male employee falling from a canoe were not taken or displayed because of gender. The slides were taken and displayed to capture the spirit and share the events of company outings. While both Ms. Trotta and the male employee may have been embarrassed by the slides, neither of them was singled out because of their gender.

### IV. Affected a Term, Condition or Privilege of Employment

■ To affect a term, condition or privilege of employment, the conduct must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986); *Ellison v. Brady,* 924 F.2d 872, 876 (9th Cir.1991). "[T]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Ellison* 924 F.2d at 878; *see King v. Board of Regents,* 898 F.2d 533, 537 (7th Cir.1990) ("Although a single act can be enough ... generally, repeated incidents create a stronger claim of hostile environment, with the strength of the claim depending on the number of incidents and the intensity of each incident"). Therefore, a showing of pervasiveness lessens the required showing of severity, and conversely, a showing of severity lessens the required showing of pervasiveness.

■ To be deemed "pervasive," the conduct complained of must be "continuous and concerted," and not merely episodic. *Carrero,* 890 F.2d at 577; *see, e.g., Kotcher,* 957 F.2d 59, 62 ("The incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief"); *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184,

1189 (2d Cir.1987) ("A hostile working environment is shown when the incidents of harassment occur either in concert or with a regularity that can be reasonably be termed pervasive"). "The offensiveness of the individual actions complained of is also a factor to be considered in determining whether actions are pervasive." *Carrero*, 890 F.2d at 578. Whether the conduct in question violates Title VII is to be determined from the totality of the circumstances. *Vinson*, 477 U.S. at 69, 106 S.Ct. at 2406; *see Carrero*, 890 F.2d at 577; *Danna*, 752 F.Supp. at 610. The conduct must be viewed from the standard of a reasonable person. *Danna*, 752 F.Supp. at 609–610; *Bennett*, 705 F.Supp. at 984.[1]

As well as affecting the reasonable person, the plaintiff must be adversely affected by the allegedly offensive conduct. *See King*, 898 F.2d at 537 (the court must conclude that the conduct would adversely affect both a reasonable person and the particular plaintiff bringing the action); *Andrews*, 895 F.2d at 1482 (same). "The subjective factor is crucial because it demonstrates that the alleged conduct injured this particular plaintiff giving her a claim for judicial relief. The objective factor, however, is the more critical for it is here that the finder of fact must actually determine whether the work environment is sexually hostile." *Andrews*, 895 F.2d at 1483.

■ Ms. Trotta has failed to show that the conditions of her employment were altered or that she was subjected to a hostile work environment. While Ms. Trotta's employment situation changed at Mobil, this change did not stem from a hostile environment, but from Mobil's corporate reorganization. Ms. Trotta's consternation with Mobil stems from limited opportunities for promotion open to her because of her refusal to relocate, not from the alleged sexually hostile environment. While Ms. Trotta found several incidents that occurred during the seven and one-half years at Mobil offensive, she has failed to show that these incidents altered the conditions of her employment.

Ms. Trotta has also failed to show that the incidents were sufficiently severe or pervasive to create a hostile work environment. Few of the incidents were directed at Ms. Trotta. The incidents spanned a period of seven and one-half years and were often separated by approximately a year. In addition, Ms. Trotta testified that her supervisors or Employee Relations addressed her complaints when she raised them. A reasonable person in Ms. Trotta's position would not have felt that there was a sexually hostile environment at Mobil. It is worth noting that having strippers at company-sponsored social functions and showing slides of a woman's silhouette at a company meeting are wholly inappropriate and contribute to creating a sexually hostile work environment. In this case, however, the allegedly offensive conduct is neither sufficiently severe or pervasive to constitute a sexually hostile work environment for purposes of Title VII.[2]

---

1. Some circuits have chosen to view the conduct from the perspective of a "reasonable victim," which takes account of the plaintiff's gender. *See, e.g., Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir.1991); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1483 (3rd Cir.1990); *Yates v. Avco Corp.*, 819 F.2d 630, 637 (6th Cir.1987). The primary rationale behind this gender-specific standard is that a traditional reasonable person standard cannot account for "the wide divergence between most women's views of appropriate sexual conduct and those of men." *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 626 (6th Cir.1986) (Keith, C.J., dissenting); *see Ellison*, 924 F.2d at 879 (the reasonable person standard "tends to be male biased and tends to systematically ignore the experiences of women").

In applying a reasonable person standard, courts can take account of gender-based differences. In a Title VII sexual harassment case involving a man's harassment of a woman, courts must consider that one purpose of Title VII was "to prevent the perpetuation of stereotypes and sense of degradation which serve to close or discourage employment opportunities for women." *Andrews*, 895 F.2d at 1483. Similarly, courts must neither trivialize the effects of sexual harassment upon a woman nor cling to ingrained notions of what male offenders may consider reasonable behavior. *See Ellison*, 924 F.2d at 879; *Rabidue*, 805 F.2d at 626 (Keith, C.J., dissenting).

2. Ms. Trotta has also failed to demonstrate constructive discharge. In order to establish constructive discharge in violation of Title VII, the trier of fact must find that the " 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's

### V. Respondeat Superior

 In determining whether an employer is liable for a sexually hostile work environment, courts "look to agency principles for guidance." *Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986). In explaining these principles, the Second Circuit has stated that a "plaintiff must prove that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Kotcher*, 957 F.2d 59, 63 (citing *Snell v. Suffolk County*, 782 F.2d 1094, 1104 (2d Cir.1986)). "[E]mployers are liable for failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1515–16 (9th Cir.1989); *see Andrews*, 895 F.2d at 1486; *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316 (11th Cir.1989). The EEOC guidelines provide that an employer's remedy should be "immediate and appropriate." 29 C.F.R. § 1604.11(d). Moreover, an employer's remedy must be real, and not a "sham." *See Kotcher*, 957 F.2d 59, 64.

 Mobil provided a forum to address complaints of sexual harassment and it took steps to prevent and remedy incidents of sexual harassment. Mobil promulgated its sexual harassment policy in a management guide effective April 1, 1981. The guide defined sexual harassment, charged managers with the responsibility to communicate Mobil's refusal to tolerate sexual harassment, established complaint procedures, insulated employees from retaliation if they complained of sexual harassment, and vowed to take appropriate disciplinary action in cases of policy violations. In addition, Mobil conducted seminars on sexual harassment for its employees. Ms. Trotta was aware of Mobil's policy on sexual harassment and availed herself of its remedial provisions. When Ms. Trotta made complaints to her supervisors or Employee Relations, they responded and took effective remedial actions.

### CONCLUSION

Plaintiff has failed to establish that she was subjected to a sexually hostile work environment or that the terms of her employment were altered in violation of Title VII. Plaintiff's claims are therefore dismissed in their entirety and judgment is to be entered in favor of defendant.

SO ORDERED.

---

shoes would have felt compelled to resign.'" *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir.1983) (quoting *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir.1977)). A reasonable person in Ms. Trotta's position would not have found working conditions so difficult or unpleasant that she would feel compelled to resign.