Dorothy B. JOHNSON

v.

TOWER AIR, INC. and Morris Nachtomi.

No. CV–90–3085.

United States District Court,
E.D. New York.

July 8, 1993.

Robert W. Seiffert, Oceanside, NY, for plaintiff.

Robert N. Chan, Ferber Greilsheimer Chan & Essner, New York City, for defendants.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Plaintiff, a former flight attendant trainee, brings this action under 42 U.S.C. § 1983 and Title VII, 42 U.S.C. § 2000e *et seq.*, alleging that her former employer and its president subjected her to workplace sexual harassment. By this motion, defendants seek summary judgment on all claims, attorney's fees under 42 U.S.C. §§ 1988 and 2000e–5(k), and sanctions under Rule 11 of the Federal Rules of Civil Procedure. As an alternative to granting their summary judgment motion, defendants move pursuant to Rule 39(a)(2) of the Federal Rules of Civil Procedure for an order striking plaintiff's jury demand. For the reasons described below, defendants' motion for summary judgment is granted in its entirety and defendants' motion for fees and sanctions is granted in part.

## FACTS

This case arises out of the hiring and subsequent dismissal of plaintiff Dorothy Johnson as a probationary flight attendant in the employ of defendant Tower Air, Inc. ("Tower"). Defendant Tower is an airline that flies scheduled and charter flights. Defendant Morris Nachtomi is and was the President of that airline during plaintiff's six-month period of employment.

Before examining the undisputed facts leading to plaintiff's dismissal, it is helpful to set forth some preliminary information concerning Tower's operating procedure. While aboard an airplane, a flight attendant's immediate supervisor is an in-flight manager ("IFM") who, in turn, reports to the plane's engineer, followed by the first officer, and finally the captain. (Deposition of Dorothy Johnson, dated June 3 and 4, 1991, at 35)[1] Those four persons, along with the flight attendants, comprise an airplane's crew. The crew to which a trainee flight attendant is assigned changes frequently, so that in Johnson's experience she reported to different persons on each of her flights. (Johnson Dep. at 35) Under the terms of the Crew Policy Manual (the "Crew Manual"), distributed to all new flight attendants, the first year of employment at Tower serves as a probationary period during which normal grievance procedures do not apply. (Affidavit of Beatrice Darcy, Tower Flight Attendant Manager, Exh. D) The Flight Attendant

1. Relevant portions of plaintiff's deposition are appended as exhibit A to the Affidavit of defendants' counsel Robert N. Chan; several of the same excerpts are also appended to plaintiff's opposition papers.

Manual (the "Attendant Manual"), also distributed to new hires, sets forth grounds for termination or discipline, including insubordination and failure to comply with FAA regulations and company directives. (Darcy Aff. Exh. E)

Johnson commenced her employment with Tower on June 24, 1987 and, after completing a training period, first served as a flight attendant in July of 1987. (Johnson Dep. at 33; Darcy Aff. Exh. A) On December 10, 1987, five months after completing her training, Johnson violated company policy by neglecting to notify "Crew Scheduling" that she would be unable to report for her scheduled flight. (Darcy Aff. ¶ 8) As a result, Johnson was listed as a "no show," and her scheduled flight was short-staffed. On December 11, Crew Scheduling reached Johnson and was informed that she was ill and unable to work; later that same day, Johnson appeared at Tower's annual employee Christmas party. (Darcy Aff. ¶ 8) Tower's Manager of Flight Attendants, Beatrice Darcy, responded to this behavior by writing a letter of reprimand to plaintiff, dated December 22, 1987, which states as follows:

> On December 10, 1987, you reported Medical to Ms. Hau. It has been established that you did not call Crew Scheduling as required in Chapter 1 Page 22, Company Policies of the Flight Attendant Manual. This oversight resulted in a "No Show" status on December 11, 1987 at 0700L which was your assigned flight, and caused your crew to fly short staffed. In addition while on medical status you attended the Company Christmas party. Although you

> indicated that you felt better physically this action indicated poor judgment.

> In view of the above discrepancy and that you are still on probation this letter serves as a final warning that any future infraction regarding your overall performance will result in immediate dismissal.

(Darcy Aff. Exh. F)

During approximately this same time period, from December 12 to December 27, 1987, Johnson served as an attendant on a series of international flights under the immediate supervision of IFM Angel Paladines. At her deposition, Johnson testified that Paladines made several untoward and insulting sexual remarks to her during this period, both while they were on flights and off duty. (Johnson Dep. at 55–57, 61–62, 64–65, 72, 82, 85–86)[2] Johnson also alleges that Paladines brushed against her in a sexual manner on one occasion,[3] and that Paladines "grabbed his [own] crotch" as a sexual gesture. (Johnson Dep. at 57–58, 83–84) It is important to note that in her deposition testimony Johnson acknowledges that Paladines did not direct his inappropriate language at her alone or at women alone, but that he was "hostile towards the whole crew," (Johnson Dep. at 66–69), often indiscriminately ordering crew members to "get out of [his] f\* \* \*ing face." (Johnson Dep. at 84) Despite the fact that the complaint in this action accuses Paladines of vulgarity and offensive behavior commencing in July of 1987, plaintiff's deposition reveals that her sole contact with Paladines and her allegations against him are limited to this two-week period and that those allegations

**2.** For example, on a mid-December flight from Tel Aviv to New York, Paladines allegedly called plaintiff "a goddamn b\* \* \*h and told [her] to leave him alone." (Johnson Dep. at 56–57) While off-duty in Israel, plaintiff, Paladines, and other crew members went swimming; as plaintiff changed her clothes on the beach behind a towel, Paladines allegedly said "something to the effect that what [plaintiff] needed was a good f\* \* \*." (Johnson Dep. at 61–62). On a series of flights in late December, Paladines allegedly referred to a cat on the plane as a "pussy" and complimented plaintiff on her weight loss by making "several remarks [such as] 'you look real good' and 'what does it look like under that uniform?'" (Johnson Dep. at 72). And on their final flight together, "a mix-up in the meal

count" led to a disagreement among Paladines, the captain, and plaintiff, during which Paladines allegedly called plaintiff a "b\* \* \*h" and told her "to get out of his f\* \* \*ing face; he also told the captain to get off his f\* \* \*ing back." (Johnson Dep. at 82) Paladines then allegedly said to plaintiff "I'll have your job for this" and "grabbed his crotch in an ungentlemanly-like manner." (Johnson Dep. at 82–83)

**3.** However, Johnson also states that "at the time I didn't think [Paladines's brushing by me] was in a sexual way but, yes, it was.... Well, I mean, I was busy. I didn't think anything about it." (Johnson Dep. at 57–58)

form the sole basis of her sex discrimination claims.[4]

On December 29, 1987, Paladines filed a Flight Attendant Standards Discrepancies report (the "Report") stating that Johnson had not been seated in her "jump seat" for landing during the December 27 flight to Paris, in violation of company policy and FAA regulations. (Darcy Aff. Exh. G & H) Johnson admitted at her deposition that the Report filed by Paladines was accurate. (Johnson Dep. at 109–11) In the Report, Paladines also acknowledged that he did not know what the captain had told Johnson about seating. (Darcy Aff. Exh. G) A Trip Report filed by Captain Fred King on January 15, 1988 and appended to plaintiff's opposition papers indicates that Captain King did, in fact, tell Johnson to sit in the cockpit and not in her jump seat.

On January 4, 1988, Darcy telephoned Johnson, who was home on sick leave, read her the Report, and requested a written response. According to Darcy, a written response to such reports is required because of possible FAA investigation at a later date. (Darcy Aff. ¶ 12) Darcy offered to provide a copy of the Paladines Report to Johnson; however, the parties dispute whether Johnson voiced a desire to see the Report, although they agree that Darcy did not send a copy to Johnson. Nevertheless, on January 5, 1988, Johnson wrote to Darcy and complained of the IFM's poor temperament, lack of professionalism, "foul language," and irresponsibility during the month of December. (Darcy Aff. Exh. I) Indicative of that letter's tone and content is the following paragraph:

> Mr. Paladine has an uncontrollable temper towards his assigned crew and in many cases towards the passengers. It became evident to the entire crew as time progressed that Mr. Paladine lacked management skills in order to properly command respect in his leadership capacity. He is irrational, temperamental, vulgar and unwilling to listen to logical suggestions or to attempt to give logical answers to intelligent questions.

Johnson's January 5 letter requested a full debriefing of the crew and alluded both to Paladines's Report and to Darcy's telephone call of the previous day.[5] However, Johnson's letter did not respond directly to the Report, nor did it mention any of the factual allegations that form the basis of the current harassment action. (Johnson Dep. at 115–16)

Having received no response to the Report itself, Darcy telephoned Johnson one week later and repeated her request for a written

---

4. The relevant portion of the testimony is as follows:

> Q: My understanding—and I just want to make sure that you and I are on the same wavelength—is that your claim of sexual harassment is based on statements. My belief—and I want you to correct me if I'm wrong—is these statements were made in December by Mr. Paladines, not at other times and by other people.
> A: There were other times and other people that made sexual remarks to different flight attendants, myself included, and there are several in particular that I can bring up. They are not a part of this suit, however, but they're there.

> * * * * * *

> Q: Am I correct that what the sexual harassment part of the suit is based on is statements made in December by Mr. Paladines?
> A: Yes.
> Q: This is the month of December?
> A: I only flew with Mr. Paladines the month of December. I never laid eyes on him to speak to him until the month of December. So we are talking about the month of December.

(Johnson Dep. at 54–55, 65)

5. The letter concludes:

> [I]t is necessary to state that whatever any one of the crew members might have done during this month, which might have resulted in a "write up" by Mr. Paladine, pales in comparison to his misconduct and inappropriate behavior both on and off the aircraft in a leadership role while his crew tried to represent the company we all want to take pride in serving.
> As you are aware, I am on medical leave. I am, however, requesting that there be a debriefing of this entire crew face to face with Mr. Paladine and including the cockpit. I feel this request is warranted and valid in order to obtain all the facts regarding his behavior during the month of December, and in light of a telephone call I received from you on January 5th stating certain facts regarding Mr. Paladine's write up of my performance from which you were reading and in light of certain questions asked me over the phone under these circumstances.

reply. (Darcy Aff. ¶ 13) On January 20, Darcy notified Johnson that they would have to meet on January 21 as a precondition to Johnson's return from sick leave. (Darcy Aff. ¶ 14) At the January 21 meeting, Darcy again tendered a copy of the Report to Johnson and again requested a written response. Johnson refused to discuss the Report and told Darcy to contact Captain King for any information. (Darcy Aff. ¶ 15) However, Darcy and Johnson did discuss Johnson's January 5 letter; during the course of their hour-long conversation, Johnson did not mention any of the specific actions by Paladines of which she now complains. (Darcy Aff. ¶ 16)

On January 22, 1988, Darcy and Johnson met again, this time in the presence of Tower's Vice–President of Operations and its Director of In-flight Services. (Darcy Aff. ¶ 17) Darcy again requested a written response to the Report, and Johnson again refused to comply. Darcy thereupon informed Johnson orally of her termination; she sent a letter that same day setting forth, as the reasons for dismissal, Johnson's refusal to comply with repeated requests for a written response and Johnson's "general attitude" in the matter. (Darcy Aff. Exh. J) [6] In her affidavit, Darcy states that her decision to terminate plaintiff's employment had nothing to do with the Report itself and that Paladines was not consulted and played no part in the employment decision. (Darcy Aff. ¶ 18)

On March 20, 1988, plaintiff submitted a charge of discrimination to the Equal Employment Opportunity Commission. The EEOC terminated plaintiff's claim and issued a 90–day right-to-sue letter on June 4, 1990. On September 4, 1990, Johnson timely filed this action which seeks back pay, attorneys fees, and compensatory damages under 42 U.S.C. §§ 1983 and 2000e–2(a). Defendants

now bring essentially three motions before this court. First, they seek a grant of summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure as to all claims in plaintiff's complaint. Second, they alternatively move to strike plaintiff's request for compensatory damages and demand for a jury trial. Third, defendants seek fees under 42 U.S.C. §§ 1988 and 2000e–5(k) and sanctions under Rule 11.

Before turning to each of the motions described above, there is one further factual matter to set forth. Defendant Nachtomi has stated by affidavit that he was not involved in nor aware of the transactions concerning Johnson's discipline. (Nachtomi Aff. ¶ 2) He further affirms that he never participates in decisions to terminate probationary flight attendants. (Nachtomi Aff. ¶ 2) Johnson testified that her only direct contact with Nachtomi was as follows:

Q: Did you ever meet or speak to Morris Nachtomi?

A: I was in the crew scheduling room one time when the man was in there, and I was not introduced to him.

Q: And what's the basis of your belief that he played a role in the decision to terminate you?

A: I was told by two separate people on the 21st that they were meeting with Mr. Nachtomi with reference to me in particular and the line 7 incident.

(Johnson Dep. at 148) In opposition to defendants' motions, plaintiff's attorney represents that Darcy's secretary, Yvette Hau, informed his client that Darcy met with Nachtomi prior to the dismissal; plaintiff does not include an affidavit from Hau, however. Similarly, with respect to the other factual allegations described above, Johnson's counsel has submitted an Affirmation in Opposition which

---

**6.** That letter states in full as follows:

As you were made aware, a written report was submitted by IFM F. Paladines, stating that you did not occupy your assigned jumpseat for landing into CDG on December 27, 1987. This reported action constituted a violation of your safety duties (refer to Company Policy page 1–33 paragraph 2 and Federal Aviation Regulations page 2–18 paragraph D of the Flight Attendant Manual) and necessitated a written

response, which you did not provide when requested to do so on two separate occasions. Your refusal to provide a written response and your general attitude concerning this matter is not acceptable according to Tower Air standards.

In view of your probationary status, the decision has been made to terminate your services as a Flight Attendant, effective January 21, 1988.

alleges some contrary facts of a general nature; however, he has submitted no additional affidavits from parties with first-hand knowledge.

## DISCUSSION

### I. *Summary Judgment*

As an initial matter, plaintiff originally brought this action under both 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1983. Section 1983 provides in relevant part:

> Every person who, *under color of any statute, ordinance, regulation, custom, or usage of any State* ... subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....

42 U.S.C. § 1983 (emphasis added). As defendants correctly argue, and as plaintiff's counsel conceded in papers and at oral argument, the Section 1983 claim in this case fails as a matter of law since the alleged actions by Tower, a private employer, were not taken under color of state law. *See, e.g., Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980); *Myron v. Consolidated Rail Corp.*, 752 F.2d 50 (2d Cir. 1985); *Grubb v. Broadcast Music, Inc.*, 699 F.Supp. 382, 384 (E.D.N.Y.1987). For this reason, plaintiff's Section 1983 claims were dismissed from the bench but are noted here for the purposes of the fee discussion below. This court reserved decision on defendants' motion for summary judgment on plaintiff's claims under Title VII of the Civil Rights Act of 1964, to which it now turns.

Section 2000e–2(a)(1) of Title 42 of the United States Code, the statutory prohibition on discriminatory employment practices, provides in relevant part that:

> It shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex.

42 U.S.C. § 2000e–2(a)(1). The well-known pattern of proof for a violation of Title VII—established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981) and most recently discussed in *St. Mary's Honor Center v. Hicks*, —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)—applies to sex discrimination claims and requires proof as follows: (1) the plaintiff-employee must establish a prima facie case of discrimination; (2) the defendant-employer then must articulate a legitimate non-discriminatory reason for the employment action; (3) the burden then shifts back to plaintiff to prove by a preponderance of the evidence that the legitimate reasons were a pretext for discrimination. *See also Price Waterhouse v. Hopkins*, 490 U.S. 228, 244–46, 109 S.Ct. 1775, 1787–88, 104 L.Ed.2d 268 (1989) ("once a plaintiff in a Title VII case shows that gender played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving that it would have made the same decision even if it had not allowed gender to play such a role"; plaintiff, however, always retains burden of persuasion as to whether gender was motivating factor in employment decision).

While discrimination claims often require a determination of a party's intent—normally not a subject for summary judgment—the Second Circuit has recognized that "the salutary purposes of summary judgment ... apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). Thus, the familiar standard of Rule 56 governs defendants' motion and instructs that summary judgment is appropriate when there is no genuine issue of material fact and the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Furthermore, although plaintiff Johnson, as non-moving party, is entitled to have this court resolve all reason-

able ambiguities and inferences in her favor, "Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim." *Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 116 (2d Cir.1991) (discussing plaintiff's burden of proof for summary judgment motion in age discrimination case); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (summary judgment appropriate against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

Courts have recognized two distinct forms of sexual harassment claims under Title VII: the first, known as *quid pro quo* discrimination, "occurs when an employer alters an employee's job conditions or withholds an economic benefit because the employee refuses to submit to sexual demands," *Carrero v. New York City Housing Authority,* 890 F.2d 569, 577 (2d Cir.1989) (*citing Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64–65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986)); the second, known as hostile environment discrimination, "occurs when an employer's conduct ' "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." ' " *Carrero,* 890 F.2d at 577 (*quoting Meritor,* 477 U.S. at 65, 106 S.Ct. at 2404 (*quoting* 29 C.F.R. § 1604.11(a)(3)(1985))). Plaintiff Johnson, a white female, asserts that Tower and Nachtomi discriminated against her on the basis of sex in both of the above fashions. She also claims that her employment was terminated in retaliation for writing the letter to Tower complaining about IFM Paladines. Bearing the above principles in mind, this court turns to each of plaintiff's specific allegations.

### A. Quid Pro Quo Discrimination

In order to establish a *prima facie* case of *quid pro quo* discrimination under Title VII, a plaintiff must show that she was denied an economic benefit either because of her gender or because a sexual advance was made by a supervisor and rejected by her.

*Kotcher v. Rosa and Sullivan Appliance Center, Inc.,* 957 F.2d 59, 62 (2d Cir.1992); *see also Carrero,* 890 F.2d at 579 ("The gravamen of a *quid pro quo* claim is that a tangible job benefit or privilege is conditioned on an employee's submission to sexual blackmail and that adverse consequences follow from the employee's refusal."). Thus, an employee must prove that: she belongs to a protected group; she was subject to unwelcome sexual harassment; the harassment of which she complains was based upon sex; her reaction affected tangible aspects of her "compensation, terms, conditions, or privileges of employment"; and respondeat superior. *Koster v. Chase Manhattan Bank,* 687 F.Supp. 848, 861 (S.D.N.Y.1988). If a court finds *quid pro quo* harassment by a supervisor, the employer is strictly liable for the economic injury suffered by the plaintiff. *Kotcher,* 957 F.2d at 62; *Carrero,* 890 F.2d at 579.

Plaintiff appears to allege that her rejection of sexual advances by Paladines resulted in his submitting the Report stating that Johnson was not sitting in her "jump seat" for landing which in turn led to her dismissal. As an initial matter, plaintiff has failed to submit depositions or affidavits based upon personal knowledge in support of her allegation; mere speculation is insufficient to defeat a summary judgment motion. *See Meiri,* 759 F.2d at 998 ("[C]onclusory allegations of discrimination are insufficient to satisfy the requirements of Rule 56(e)."); *Howard v. Holmes,* 656 F.Supp. 1144, 1147–48 (S.D.N.Y.1987) (same). Furthermore, although plaintiff clearly is a member of a protected group, she has failed to show, or to provide any evidence to indicate, that Paladines's Report was sexually motivated. Johnson admits that she indeed was not seated in her "jump seat" as required by the FAA and Tower safety requirements. Paladines, as Johnson's supervisor, therefore had an obligation to report the misconduct.

With respect to the fourth element of a prima facie case—that a plaintiff show her reaction to the harassment affected tangible aspects of her "compensation, terms, conditions, or privileges of employment"—the *Koster* court explained as follows:

"The acceptance or rejection of the harassment by an employee must be an *express or implied condition to the receipt of a job benefit or the cause of a tangible job detriment in order to create liability* under this theory of sexual harassment. As in the typical disparate treatment case, the *employee must prove that she was deprived of a job benefit which she was otherwise qualified to receive because of the employer's use of a prohibited criterion* in making the employment decision."

*Koster,* 687 F.Supp. at 861 (emphasis added) (*quoting Jones v. Flagship International,* 793 F.2d 714, 721–22 (5th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987) (*citing Henson v. City of Dundee,* 682 F.2d 897, 909 (11th Cir.1982))). Even accepting as true all of Johnson's factual allegations concerning the behavior of Paladines, Johnson fails to satisfy any aspect of this fourth element. First, the incidents to which she points as showing Paladines's demand for sexual favors and on which she appears to base her *quid pro quo* claim, do not support a claim that the Report was filed because plaintiff failed to satisfy some express or implied condition of employment. Plaintiff alleges that on one occasion Paladines brushed up against her and on another occasion he grabbed his crotch and shouted derogatory comments at her. As even plaintiff admits, the meaning to be derived from these incidents is far from clear. (Johnson Dep. at 83) Moreover, the facts alleged are of a wholly different nature than the facts underlying cases in which courts have found a plaintiff to state at least a *prima facie* case of *quid pro quo* discrimination. *Compare, e.g., Carrero,* 890 F.2d at 573 (allegations that supervisor engaged in unwelcome touching and kissing); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 302–03 (S.D.N.Y.1987) (history of sexual tension and hostility between supervisor and employee sufficed to state prima facie case and shift burden to defendant).

Second, plaintiff has not shown that improper reasons caused her employer to deny her any condition of employment to which she was entitled. Darcy's affidavit testimony, Johnson's deposition testimony, and the letters between these two women demonstrate that despite several requests and even a potentially reasonable explanation for her behavior, Johnson repeatedly refused to provide a written response to the Report. The Tower Flight Manual provides that insubordination is a legitimate reason for dismissing a probationary employee and that no grievance procedures are available to that employee. Darcy already had sent one written warning to plaintiff concerning her failure to report her illness to "Crew Scheduling." Finally, defendants have submitted affidavit testimony that plaintiff's refusal to respond to the Report—and not the Report itself—was the basis for Johnson's dismissal and that, other than filing the Report, Paladines had no input on company's ultimate employment decision; plaintiff does not provide any evidence to dispute these contentions. Thus, plaintiff has failed to show a link between the IFM's conduct and her termination. *See Christoforou,* 668 F.Supp. at 303 ("[I]n order to prevail on a Title VII claim, not only must the plaintiff show that the offensive conduct was a 'but for' [or 'substantial'] cause of her dismissal, she must also ultimately prove that this cause or motivation was an illegal one.... The law does not require an employer to like his employees, or to conduct himself in a mature or professional manner, or unfortunately, even to behave reasonably and justly when he is peeved."); *Potenec v. Morgan Guaranty Trust Co.,* 44 Fair Empl. Prac.Cas. (BNA) 1256, 38 Empl.Prac.Dec. (CCH) P35,599, 1985 WL 2049 (S.D.N.Y. 1985) ("Crucial to the establishment of a prima facie case is the showing of a sufficient causal nexus between plaintiff's refusal to accede to her supervisor's sexual overtures and the subsequent harassment of dismissal.").

As mentioned above, plaintiff bears the initial burden of proving that tangible benefits were denied to her on the basis of sex or gender. *See Kotcher,* 957 F.2d at 62; *see also Price Waterhouse,* 490 U.S. at 250, 109 S.Ct. at 1790–91. Johnson has not shown that Tower's decision to terminate her employment was impermissibly based on these factors or that Tower's proffered reason for dismissing Johnson were pretextual. *See Christoforou,* 668 F.Supp. at 296 (finding no

*quid pro quo* sexual discrimination as plaintiff failed to prove causal nexus between "history of sexual tension between plaintiff and the supervisor who fired her" and plaintiff's termination); *Ramsey v. Olin Corp.*, 35 Empl.Prac.Dec. (CCH) P34,710, 1984 WL 929 (S.D.N.Y.1984) (granting summary judgment to employer in sex discrimination case because employee's assertion that dismissal was pretextual rested only on co-worker's hearsay statement and not on affidavit based on personal knowledge). The absence of evidence to support plaintiff's claim of *quid pro quo* discrimination, or even to raise a material issue of fact concerning this claim, justifies this court in granting summary judgment in defendants' favor. *See Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555.

### B. *Hostile Environment*

 Johnson's second claim is that Paladines's inappropriate comments and behavior created a "hostile work environment." To state a claim for sexual harassment based upon this theory, a plaintiff is required to prove "not only actionable sex discrimination, but also that the supervisor's actions should be imputed to the employer." *Kotcher*, 957 F.2d at 62. With respect to the former element, a plaintiff must establish that the offensive behavior was "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405 (*quoting Henson*, 682 F.2d at 902); *Kotcher*, 957 F.2d at 62 ("The incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief."); *Carrero*, 890 F.2d at 577 ("The incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."); *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir.1987) ("A hostile working environment is shown when the incidents of harassment occur either in concert or with a regularity that can be reasonably termed pervasive."). With respect to the latter element, a plaintiff must show that her employer "either provided no reasonable avenue for complaint or knew of the harassment and did nothing about it." *Kotcher*, 957 F.2d at 63 (*citing Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir.1986)); *Tunis v. Corning*

*Glass Works*, 747 F.Supp. 951, 958 (S.D.N.Y. 1990), *aff'd without opinion*, 930 F.2d 910 (2d Cir.1991). This court finds the undisputed facts of this case to compel the conclusion that plaintiff has failed to satisfy either prong of this test.

Johnson's hostile environment claim is premised on Paladines's course of conduct during the two-week period between December 12 and December 27, 1987. Defendants argue that nine incidents of abusive language or obscene gestures over a two-week period is insufficient as a matter of law to give rise to a hostile environment claim. Plaintiff responds that the unique situation of an airline crew intensifies any unpleasant incidents, thereby making Paladines's offensive behavior "pervasive." Both of these statements are too extreme. The mere number or duration of offensive comments is not decisive; rather, a court must evaluate the offensiveness and continuity of the conduct in light of the totality of the circumstances. *Kotcher*, 957 F.2d at 62–63; *see also Carrero*, 890 F.2d at 578 ("It is not how long the sexual innuendos, slurs, verbal assaults, or obnoxious course of conduct lasts. The offensiveness of the individual actions complained of is also a factor to be considered in determining whether such actions are pervasive.").

Clearly, Paladines was not a pleasant person for whom or with whom to work; plaintiff's letter and deposition testimony make that fact abundantly clear. However, another fact that is clear is that Paladines was unpleasant to each member of the crew, irrespective of their sex; moreover, his comments to Johnson, although undisputedly offensive, when examined in context appear far more hostile and angry than they do sexual. Behavior that is immature, nasty, or annoying, without more, is not actionable as sexual harassment. *Porras v. Montefiore Medical Center*, 742 F.Supp. 120, 127 (S.D.N.Y.1990) ("Unfair, overbearing, or annoying treatment of an employee, standing alone, cannot constitute a Title VII sex discrimination claim."); *Christoforou*, 668 F.Supp. at 303 (same).

In sum, careful consideration of all the allegations in plaintiff's complaint in light of the relevant caselaw cited by both parties

leads this court to conclude that no reasonable trier of fact could find Paladines's conduct to be sufficiently "pervasive" to state a *prima facie* case of "hostile environment" sexual harassment. *Cf. Jones v. Wesco Invest., Inc.,* 846 F.2d 1154, 1155–56 (8th Cir. 1988) ("repeated sexual advances, request for sexual favors, and other verbal or physical contact of a sexual nature" over eight-month period sufficient to state *prima facie* case of sexual harassment); *Rabidue v. Osceola Refining Co.,* 805 F.2d 611, 622 (6th Cir.1986) (supervisor's "vulgar language, coupled with the sexually oriented posters, did not result in a working environment that could be considered intimidating, hostile, or offensive" under Title VII), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987); *Downes v. Federal Aviation Admin.,* 775 F.2d 288, 293–94 (Fed.Cir.1985) (crude jokes and sexually explicit remarks not sufficiently "routine" to constitute harassment); *Scott v. Sears, Roebuck & Co.,* 798 F.2d 210, 213–14 (7th Cir.1986) (affirming summary judgment because repeated comments and touching "not so severe, debilitating or pervasive that it created an actionable hostile environment claim within the current interpretation of Title VII"); *Fair v. Guiding Eyes for Blind, Inc.,* 742 F.Supp. 151, 155–56 (S.D.N.Y.1990) (granting summary judgment for defendants on hostile environment claim despite supervisor's repeated and uninvited conversations on sexual matters over four-month period); *Barbetta v. Chemlawn Services Corp.,* 669 F.Supp. 569, 572–73 (W.D.N.Y.1987) (proliferation of demeaning incidents, including pornography and unwelcome physical sexual contact, over two-year period stated *prima facie* case of harassment); *Porras,* 742 F.Supp. at 126 (granting summary judgment for defendant on hostile environment claim because "shrieking" at women not gender-based harassment); *Trotta v. Mobil Oil Corp.,* 788 F.Supp. 1336, 1342, 1350 (S.D.N.Y. 1992) (strippers and offensive slides at company-sponsored functions and comments over extended period of time not sufficient for *prima facie* case of hostile environment discrimination).

■ In addition to finding plaintiff's allegations insufficient to constitute a hostile environment claim, this court finds that the behavior by Paladines cannot be imputed to Tower. Johnson did not inform Tower or its agents of Paladines's behavior; her January 5 letter to Darcy, containing a litany of complaints about Paladines concerning his lack of professionalism and his discourtesy to members of the crew, mentions nothing about sexual harassment.[7] Furthermore, Darcy affirms and Johnson does not deny that no mention was made at their meeting or during their telephone conversations concerning the factual bases for her hostile environment sex discrimination claims. Thus, plaintiff presents no facts to indicate that defendants knew or should have known of the behavior alleged in this complaint. *See Snell,* 782 F.2d at 1104 (finding that employer took inadequate measures to avoid proliferation of discriminatory behavior because "once an employer has knowledge of a [discriminatory or] combative atmosphere in the workplace, he has a duty to take reasonable steps to eliminate it"); *Tunis,* 747 F.Supp. at 958 (refusing to charge employer with knowledge based on isolated incidents which plaintiff did not bring to management's attention).

For these reasons, defendants' motion for summary judgment as to plaintiff's hostile environment claim is hereby granted and that claim is dismissed in its entirety.[8]

### C. *Retaliatory Discharge*

■ Plaintiff's final Title VII claim is one for retaliatory discrimination in violation of

---

7. This general behavior is confirmed by Johnson's deposition testimony, which acknowledges that Paladines treated the other members of the crew—men and women alike—in a nasty and derogatory fashion.

8. As a factual matter, even if this court found that plaintiff stated a Title VII claim against Tower, she fails to allege any authentic factual basis for finding defendant Nachtomi personally liable. The evidence submitted by defendants indicates that Nachtomi was in no way involved in Johnson's termination. The conclusory hearsay statements in the affirmation of counsel for plaintiff do not suffice to create such a factual dispute. *See* Fed.R.Civ.P. 56(e); *United States v. Aiello,* 912 F.2d 4, 7 (2d Cir.1990), *cert. denied,* 498 U.S. 1048, 111 S.Ct. 757, 112 L.Ed.2d 777 (1991); *Wyler v. United States,* 725 F.2d 156, 160 (2d Cir.1983).

Section 2000e–3(a). To establish a prima facie case of retaliation, " 'a plaintiff must show participation in protected activity known to the defendant, an employment action disadvantaging the person engaged in the protected activity, and a causal connection between the protected activity and the adverse employment action.' " *Kotcher,* 957 F.2d at 64 (*quoting Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991)). In this case, Johnson's retaliation claim is clearly deficient since she provides no evidence that her letter of January 5 played any role in Tower's decision to dismiss her; in fact, the letter does not even accuse Paladines of an employment practice prohibited by Title VII. Accordingly, defendants' motion for summary judgment is granted as to this claim as well. *See Sheehan v. Purolator, Inc.,* 49 Fair Empl. Prac. Cas. (BNA) 996, 43 Empl. Prac. Dec. (CCH) P37,165, 1987 WL 12017 (E.D.N.Y.1987) (dismissing retaliation claim since termination justified by plaintiff's "uncooperative and contentious" attitude), *aff'd,* 839 F.2d 99 (2d Cir.1988), *cert. denied,* 488 U.S. 891, 109 S.Ct. 226, 102 L.Ed.2d 216 (1988); *see also Howard,* 656 F.Supp. at 1148 (granting summary judgment to defendant on retaliation claim because plaintiff's "conclusory allegations of retaliatory animus are insufficient to raise an inference of retaliatory discrimination").

#### D. *Remaining Issues*

Before turning to defendants' motion for costs, fees, and sanctions, it is worthwhile to mention briefly the claims that plaintiff withdrew in light of defendants' motion for summary judgment. Plaintiff originally requested a jury trial which was not available for Title VII claims under the applicable law. *See, e.g., Wade v. Orange County Sheriff's Office,* 844 F.2d 951, 953 (2d Cir.1988). Plaintiff conceded this well-settled point in her responsive papers. Plaintiff also requested one million dollars in compensatory damages for medical expenses, pain, and suffering. Under then-applicable law, subsection 2000e–5(g) of Title 42 of the United States Code, a successful Title VII plaintiff could receive money damages available only for back pay, subject to plaintiff's duty to mitigate. 42 U.S.C. § 2000e–5(g); *see also Carrero,* 890 F.2d at 581 ("Having found liability against [defendant] only under Title VII and none under § 1983, no award for pain and suffering may be recovered.... This follows because neither compensatory nor punitive damages are recoverable under Title VII."). Plaintiff conceded this point as well.[9]

#### II. *Attorney's Fees and Sanctions*

Defendants move this court for an award of attorney's fees pursuant to 42 U.S.C. §§ 1988 and 2000e for, respectively, their defense against plaintiff's claims under Section 1983 and their motion for summary judgment under Title VII. Additionally, they move for Rule 11 sanctions against plaintiff and her attorney for continuing to assert baseless claims: against Nachtomi; for compensatory damages; and for retaliatory termination. For the following reasons, defendants' motion for fees and sanctions is granted in part and denied in part.

Section 1988 of Title 42 of the United States Code provides in pertinent part as follows:

> In any action or proceeding to enforce a provision of section ... 1983 ... of this title ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

42 U.S.C. § 1988. And Section 2000e–5(k) of that same title provides:

---

**9.** The Civil Rights Act of 1991, Pub.L. No. 102–106, 105 Stat. 1071, changed both principles. Section 102 of the Act allows plaintiffs to demand jury trials and compensatory and punitive damages. Plaintiff never submitted papers claiming that Section 102 applied retroactively to her claim. Furthermore, the Second Circuit has held that those provisions do not apply retroactively, *see Wisdom v. Intrepid Sea–Air Space Museum,* 993 F.2d 5 (2d Cir.1993); the Supreme Court has granted *certiorari* to resolve the question of retroactivity. *See Harvis v. Roadway Express, Inc.,* 973 F.2d 490 (6th Cir.1992), *cert. granted in part sub nom. Landgraf v. USI Film Products,* — U.S. —, 113 S.Ct. 1250, 122 L.Ed.2d 649, and *Landgraf v. USI Film Products,* 968 F.2d 427 (5th Cir.1992), *cert. granted in part,* — U.S. —, 113 S.Ct. 1250, 122 L.Ed.2d 649 (1993).

In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs.

42 U.S.C. § 2000e–5(k). Courts have allowed successful defendants to collect attorneys fees incurred in defending a claim that is "frivolous, unreasonable, or groundless" under both statutory sections without demonstrating bad faith on the part of the plaintiff. *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 422, 98 S.Ct. 694, 701, 54 L.Ed.2d 648 (1978); *Colombrito v. Kelly,* 764 F.2d 122 (2d Cir.1985). However, in *Christiansburg* the Supreme Court cautioned as follows:

[A] plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so. And, needless to say, if a plaintiff is found to have brought or continued such a claim in bad faith, there will· be an even stronger basis for charging him with the attorney's fees incurred by the defense.

434 U.S. at 422, 98 S.Ct. at 701.

■ Rule 11 of the Federal Rules of Civil Procedure provides that:

The signature of an attorney ... constitutes a certificate ... that to the best of the signer's knowledge, information, and belief *formed after reasonable inquiry* it is well grounded in fact and is warranted by the existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper including a reasonable attorney's fee.

Fed.R.Civ.P. 11 (emphasis added). The imposition of sanctions under Rule 11 does not depend on a subjective showing of the signer's bad faith. *Eastway Constr. Corp. v. New York,* 762 F.2d 243, 253–54 (2d Cir. 1985). Rather, a court must evaluate the conduct of the person who signed the pleading under a standard of objective reasonableness. *Derechin v. State University of New York,* 963 F.2d 513, 520 (2d Cir.1992); *see also Paganucci v. New York,* 993 F.2d 310 (2d Cir.1993) ("[T]he applicable test [in this circuit] is whether a reasonably competent attorney would have acted similarly."). Once a court finds a Rule 11 violation, it must impose an appropriate sanction. *United States v. International Brotherhood of Teamsters, etc.,* 948 F.2d 1338, 1344 (2d Cir. 1991). Finally, under the express language of Rule 11, attorney's fees may be awarded to an opposing party, although such an award serves not to compensate the opposing party but to deter a violator from future misconduct. *Anschutz Petroleum Marketing Corp. v. E.W. Saybolt & Co.,* 112 F.R.D. 355, 357 (S.D.N.Y.1986).

■ In this case, it is clear that plaintiff's Section 1983 claim never asserted any plausible right to recover from defendants. Defendants' counsel affirms that he attempted to make this and other deficiencies in the complaint clear to plaintiff's counsel at Johnson's deposition in June of 1991. (Chan Aff. ¶¶ 17–18) At that time, the attorneys engaged in the following colloquy:

Mr. Chan: I would like to note again, yesterday I advised you of your obligations under Rule 11 and of the gulf between your pleading and those obligations, and I did so not because of any animosity I feel against you personally, but because there is authority that if you want to bring a claim for compensation for sanctions under Rule 11, that you must give warning to the other side.

Mr. Seiffert: I under—

Mr. Chan: And I'm doing that. We have now had two days of deposition. I see absolutely no basis for your case against Tower Air.

Your case against Morris Nachtomi, however, I must say, as a member of the bar is an outrage.... You have prepared

absolutely no evidence and this deposition has revealed none that Mr. Nachtomi had any role whatsoever in any of the decisions which give rise to your claims, and I demand at this moment that you agree to amend your pleading and drop your claim against Mr. Nachtomi in his personal capacity.

Mr. Seiffert: I will take your request under advisement and will confer with my client and get back to you within the week.

(Johnson Dep. at 181–83) Plaintiff's counsel failed to respond as promised, and defendants therefore filed the motions now before this court in mid-July of 1991.

In response to defendants' motion for fees and sanctions, plaintiff's counsel states as follows:

As an attorney with limited experience in Federal Court matters, I pursued a claim for Sexual Discrimination on behalf of my client, Dorothy B. Johnson. I believe this was pursued in good faith and based upon the factual allegations presented to me by my client, I prepared a Complaint under a limited time schedule based upon my client's timing in authorizing me to pursue this matter after the Right to Sue letter was received from the EEOC on or about June 1990. . . .

After a thorough research of the law pertaining to a USC 1983 Action, I now realize that my client legally is not entitled to proceed under USC 1983 Action. . . . I believed that the due process clause and the equal rights clause of the constitution gave rise to a cause of action and denied a property right re; the right to work at a job which was her life long dream. Therefore, I must concede that I can not go forward with an argument that the discrimination was under color of law and therefore certain relief which was requested could not be granted, i.e.; compensatory damages for medical expenses and pain and suffering. I would therefore concede that accordingly these requests for relief should be withdrawn. I further realize that pursuant to title VII, I am not entitled to a jury trial.

(Seiffert Aff. at 1–2)

Based on the facts recounted above, this court finds that Mr. Seiffert, whose signature is affixed to the complaint, failed to make a reasonable inquiry into the legal basis for the Section 1983 claim that he filed in violation of Rule 11. While this court sympathizes with the predicament of a solo practitioner unfamiliar with federal proceedings, it also recognizes that counsel was given an opportunity to withdraw any baseless claims prior to defendants filing this motion; not only did he fail to do so, but also he failed to contact defense counsel as promised. Accordingly, this court hereby imposes upon plaintiff's attorney a sanction of $1,000.00 which it finds to be an amount suited to deterring similar conduct in the future.[10]

## CONCLUSION

For the reasons stated above, defendants' motions for summary judgment and Rule 11 sanctions are hereby granted and defendants' motions for fees under Sections 1988 and 2000e–5(k) are denied.

SO ORDERED.

---

10. As this court finds imposing sanctions on plaintiff's counsel under Rule 11 to be the appropriate response to the Section 1983 claim filed herein, it consequently finds discussion of defendants' fee request under Section 1988 unnecessary. With respect to fees under Section 2000e–5(k), despite the fact that plaintiff's Title VII claims resulted in a grant of summary judgment for defendants, those claims had sufficient basis in law and fact to justify denying defendants' motion for fees. Once the Section 1983 claim was stricken from the complaint, plaintiff had no basis for her jury trial and compensatory damages demands; nevertheless, a legitimate basis for those demands under Title VII did arise during the pendency of these motions. Taking all of the circumstances of this case into consideration, this court declines to award fees for defendants' motions to strike those particular demands as well.